In the Matter of the ESTATE of Erma
Z. THOMAS, Deceased.

Lawrence THOMAS, Petitioner
and Appellee,

v.

Rosella BELLAND, Grace Haller, Carl
Thomas, Lowell Thomas, Sheryl Thomas
Allen, Roger Thomas, Thomas Urlacher,
Lawrence Urlacher, Ralph Urlacher, Syl-
vester Urlacher, Genevive Tompers, Jo-
sephine Dubisar, Sister Monica Urlacher
and Herbert Urlacher, Respondents and
Appellants.

Civ. No. 9656.

Supreme Court of North Dakota.

March 13, 1980.

Reichert, Howe, Hardy, Galloway & Jorgensen, and Robert Keogh, Dickinson, for petitioner and appellee; argued by Albert J. Hardy, Dickinson.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for respondents and appellants; argued by Ward M. Kirby, Dickinson.

PEDERSON, Justice.

This is an appeal from a judgment of the District Court of Hettinger County admitting to probate a will and codicil of Erma Z. Thomas. We affirm.

Lawrence Thomas, Erma's son and executor of her estate, applied to Hettinger County Court for formal probate of the will and codicil. Thereafter, objection was made to probate by Rosella Belland, et al., (Erma's other heirs) on three grounds: (1) that Erma lacked testamentary capacity to make such will and codicil; (2) that Erma was subject to undue influence; and (3) that the will and codicil were not executed in accordance with the statutory requirements in effect at the time of execution. The county court rejected the will and codicil for probate.

Lawrence Thomas appealed the county court decision to district court, where the issues were tried anew (Section 30–26–23, NDCC). The district court found the will and codicil valid and admitted them to probate. This appeal followed.

A summary of the background information will be helpful to understand the situation.

Peter and Erma Thomas operated a farm consisting of seven quarters of land southeast of New England, North Dakota. Their son Lawrence started farming with them in 1943, and continued until 1948 when he was able to obtain other land of his own.

In 1958 Peter and Erma asked Lawrence to take over their farm. Initially they made an arrangement where Lawrence could rent the farm on a crop-share basis. Thereafter, in 1960, a contract was entered into for the sale of five of the seven quarters of land they owned for $47,800, or approximately $50 per acre. Of the two remaining quarters, one was retained for the protection of an incompetent daughter and one for Erma so that she would have income until she died. Lawrence testified that they agreed that upon the death of his sister and his mother, he was to have the right to buy this remaining land for $50 an acre also, although this was not in the written contract.

Not long after the contract for deed was prepared, Peter and Erma Thomas had their attorney, Mr. Striebel, prepare identical wills for each of them. It is not known whether Peter ever executed his will as, upon his death on December 24, 1970, his will could not be found. His estate was probated pursuant to the laws of intestacy. By this time Peter's incompetent daughter had predeceased him, so the southwest quarter of land in Section 6–133–95 that had been left for her was the only major item of real property to be distributed. The other quarter of land not covered by the contract for deed with Lawrence, the southeast quarter of Section 16–133–97, had been held in joint tenancy with Erma and Peter, so went automatically to Erma.

Sometime after Peter's death, Erma requested and received quitclaim deeds from each of the parties who had inherited an interest in the southwest quarter of Section 6, making her the sole owner.

Approximately two weeks after Peter's death, Erma and her son, Alex, examined Erma's will that had been drafted in 1960 and discovered it had never been signed. Lawrence arrived while they were reviewing the will and he and Alex suggested to Erma that the will should be signed. Lawrence made an appointment for Erma to see her attorney, Mr. Striebel, and gave her a ride to his office the next day. Lawrence did not remain at the office but rather left Erma to consult with Mr. Striebel.

Mr. Striebel testified that he suggested he could redraft the will as two of the named beneficiaries, Peter and a daughter, had died. He testified that Erma said the will carried forth the plan that she and Peter had wanted and that, unless it was

illegal, she wished to use the same will. Mr. Striebel explained the will was not illegal and could be redated, and that the property bequeathed to the daughter would go to the other beneficiaries. Consequently, Erma executed the will that day, January 11, 1971.

This will declared that, upon the death of the incompetent daughter, Lawrence Thomas was to have the privilege of purchasing the quarter of land in Section 6 upon the payment of the sum of $50 per acre. The following day a codicil to the will was executed which gave Lawrence the option to buy the other quarter of land in Section 16 which Erma owned for the same price ($50 per acre).

Erma passed away on January 3, 1978. Proceedings were commenced to have her will and codicil probated, and objections were made thereto.

■ In our review of the district court's determination in this case admitting the will and codicil to probate, we will not set aside the district court's findings of fact unless they are clearly erroneous. Rule 52(a), NDRCivP. A finding of fact is "clearly erroneous" when, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973).

I.

Did Erma have the testamentary capacity to make a will and codicil?

■ We start with the principle that sanity and testamentary capacity are presumed, and the burden of proving otherwise is upon the contestants. *Stormon v. Weiss*, 65 N.W.2d 475 (N.D.1954); *Black v. Smith*, 58 N.D. 109, 224 N.W. 915 (1929). In *Stormon v. Weiss, supra*, at 504–505, this court gave the following standard for testamentary capacity:

"Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of

which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts; . . . He must also be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed."

This inquiry is directed to the testator's condition of mind at the very time he or she signed the will. *Stormon v. Weiss, supra.*

■ The district court specifically found:.

"VII.

"The decedent, Erma Z. Thomas, knew at the time of the execution of her Will and Codicil what property she owned and particularly as regards the two quarter sections of land owned by the decedent.

"VIII.

"The decedent discussed her property and the value of the two quarters of land with her daughters, Rosella Belland and Grace Haller. That on one occasion the decedent discussed the value of the land with her next door neighbor.

"IX.

"The decedent knew who her heirs were at the time of the execution of the Last Will and Testament.

"XI.

"That on the 11th and 12th day of January, 1971, the subscribing witnesses to the Will and Codicil, Betty M. Striebel and Adeline Bogner, were impressed as to the sharpness and alertness of the decedent."

The appellant asserts that these findings are clearly erroneous because certain factors show Erma did not know the nature and extent of her property or who her heirs were:

(1) Erma's will devised property (the SW ¼ of Section 6), which she technically did not own at the time the will was executed.

(2) Erma did not consider changes in the value of the land between 1960 and 1970.

(3) Peter and a daughter, who were beneficiaries under the will, were already deceased when the will was executed.

Erma did not gain title to the SW ¼ of Section 6 until her children quitclaimed it back to her and these deeds were not actually signed and recorded until several months after the will was executed. However, she had discussed and requested this arrangement from her children in a family meeting *before* the will was executed so it was reasonable for her to assume that, since she was probably going to gain title to the property, she could include it in her will.

Erma's will and codicil contained provisions allowing Lawrence to purchase the remaining two quarters of land for $50 per acre, when she could have received $350 per acre from outside parties. It is certainly not unnatural for a parent to allow her son, who has faithfully remained and farmed the family land, to purchase this land for a price that is less than she could obtain from strangers. Furthermore, there was evidence here that this was the plan she and Peter had decided upon many years in the past.

Mr. Striebel, her attorney, testified that Erma knew what the value of her property was, where her property was, and where she wanted it to go. He and Erma discussed the matter of the two named beneficiaries who had passed away. He explained the property would go to the others and that using the old will was not illegal.

There is ample evidence in the record to support the district court's findings.

## II.

Did Lawrence Thomas exercise undue influence upon Erma?

The existence or nonexistence of undue influence is a question of fact. *Mehus v. Thompson,* 266 N.W.2d 920, 926 (N.D.

1978); *In re Estate of Elmer, supra.* Again, the burden is on the contestants to sustain this challenge. *Stormon v. Weiss, supra.* Further, "a mere suspicion of undue influence is not sufficient . . . to sustain a verdict." *Matter of Estate of Wagner,* 265 N.W.2d 459, 465 (N.D.1978).

The appellants contend that Lawrence had Erma's confidence and that she relied upon him. They assert that it was Lawrence who urged his mother to sign her will and that he kept its existence a secret from them. They also assert that certain actions Erma took, such as extending the time for payment of the contract for deed on the land, showed that Lawrence was exercising undue influence on Erma.

The district court made the following findings of fact regarding this issue:

### "X.

"That the decedent did rely on her son, Lawrence Thomas, for certain business advice as to investments and the like, but the decedent made the ultimate decisions on her own and did at all times sign all of her own checks.

### "XII.

"That the evidence submitted by the Respondents does not show fraud or any duress exercised by any person upon the decedent, Erma Z. Thomas, at the time of the execution of her Will and Codicil.

### "XIII.

"That the evidence submitted by the Respondents does not show that Erma Z. Thomas was not making decisions on her own, nor that she was not handling her own affairs. The evidence further does not show that the decedent, Erma Z. Thomas, was subject to anyone's influence.

### "XIV.

"The Petitioner, Lawrence Thomas, had the confidence of Erma Z. Thomas,

and she did rely on him and that, therefore, Lawrence Thomas had an opportunity to exercise undue influence.

"XV.

"The evidence submitted by the Respondents does not point to or show any overt action on the part of Lawrence Thomas wherein he showed his disposition to exercise undue influence."

The critical inquiry is whether or not, *at the time of the execution of the will,* the testatrix was subject to undue influence. Erma executed her will approximately two weeks after the death of her husband. While Peter was alive, he handled their business affairs and she turned to him for advice, not Lawrence. All Lawrence did at this critical period was to suggest, along with his brother, Alex, that Erma's will should be signed, and he gave Erma a ride to her attorney's office the day she executed her will. Lawrence did not remain at the office with Erma while she consulted with her attorney.

As the years went by after Peter's death, Erma did turn to Lawrence for business advice and help. However, there was no evidence that she was not able or willing to make the ultimate decisions on her own. Further, there is little relevance between actions Erma took in the seven years after the execution of her will to the issue of whether or not she was subject to undue influence at the time of the execution of her will.

Lawrence received a benefit from Erma's action in executing the will and codicil. However, this is not a situation where a presumption of undue influence arises due to the relationship of the parties. Under § 59–01–16, NDCC, there is a presumption of undue influence when a trustee obtains any advantage from his beneficiary. In *Matter of Estate of Mehus,* 278 N.W.2d 625 (N.D.1979), we held that in a transaction between a principal and agent in which the agent obtains a benefit, a presumption arises against its validity which the agent must overcome. In *Matter of Estate of Mehus,* the appellant was acting as co-attorney-in-fact for his mother.

In the instant case, when Erma's will and codicil were executed, Lawrence was not Erma's trustee, agent, or attorney-in-fact. In *Matter of Estate of Wagner, supra,* we rejected the argument that whenever a confidential relationship exists between a party and the testator, coupled with that same party participating in the preparation of the will and receiving a benefit by its terms, a presumption of undue influence arises which shifts the burden of proof.

■ We agree with the district court that there is no evidence of undue influence in the instant case.

III.

Were the will and codicil properly executed?

When Erma executed her will and codicil in 1971, § 56–03–02, NDCC, provided how wills must be executed and attested. Erma died in 1978 and, at this time, Chapter 56 had been repealed by § 82, Chapter 257, Session Laws 1973, and replaced with the Uniform Probate Code (Chapter 30.1). Lawrence argues that in enacting the Uniform Probate Code, our Legislature provided that it would apply to all wills of decedents dying after July 1, 1975. Section 30.1–35–01, NDCC, provides in relevant part as follows:

"1. This title takes effect on July 1, 1975.

"2. Except as provided elsewhere in this title, on the effective date of this title:

a. It applies to any wills of decedents dying thereafter. . . ."

The appellants, on the other hand, argue that as to the formal validity of the will and codicil, one must look to see if the requirements for proper execution were followed that existed at the time of such execution. They contend that the will and codicil in the instant case were not declared by the testatrix as required by § 56–03–02, NDCC. The appellants urge that a will and codicil, invalid upon execution, cannot

thereafter acquire a validity with the adoption of the Uniform Probate Code.

■ Although we agree in principle with the appellants' argument, and hold that § 56–03–02, NDCC, controls, we do not agree with their interpretation of what it takes to "declare" that an instrument is one's will.

■ Section 30.1–35–01 provides that the Uniform Probate Code applies to wills that have been executed before its effective date, if the testator's death occurs thereafter. However, the will must have been validly executed in order for the Uniform Probate Code provisions to apply. The Uniform Probate Code Practice Manual, a project of the Association of Continuing Legal Education Administrators, American Bar Association, Vol. 2, page 602, explains that " . . . Section 2–506 contains a special rule making the law *as to the time of execution* controlling in regard to the formal validity of a will." [Emphasis added.] [1]

Section 56–03–02, NDCC, provided that a will must be executed as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person, in his presence, and by his direction, must subscribe his name thereto;

"2. It must be subscribed in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority;

"3. The testator, at the time of subscribing or acknowledging the same, must declare to the attesting witnesses that the instrument is his will;

"4. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request, and in his presence;

"5. A witness to a written will must write with his name his place of residence; and a person who subscribes a testator's name by the testator's direction must write his own name as a witness to the will. A violation of this subsection does not affect the validity of the will."

The district court made the following findings of fact regarding Erma's execution of her will:

"III.

"That the Will dated January 11, 1971, and Codicil thereto dated January 12, 1971, were in writing, signed by the testator, Erma Z. Thomas. That such execution by the testator was done in the presence of two witnesses, Betty M. Striebel and Adeline Bogner, each of whom witnessed, at the time of the decedent's signing, the signature of the Will and Codicil.

"IV.

"That the decedent, Erma Z. Thomas, made known to Adeline Bogner and Betty M. Striebel at the time of the execution of the Will and Codicil by her words and conduct that the instrument that she was signing was the testator's Last Will and Testament.

"V.

"That prior to the decedent's signing of her Will and Codicil, each of the instruments were read to her, the Will having been read to her by Robert Striebel and the Codicil read to the decedent by Betty M. Striebel, and the same were explained to her. That following such reading of the Wills to the decedent, the decedent, Erma Z. Thomas, answered affirmatively to the question that the instruments reflected what she wanted.

"VI.

"That the conduct and actions of the decedent at the time of the execution of the Will and Codicil were such that the

---

1. Section 2–506 is enacted in North Dakota as § 30.1–08–06.

decedent wanted Adeline Bogner and Betty M. Striebel to sign as her witnesses."

It is uncontroverted that Erma did sign her will and codicil in the presence of the attesting witnesses and that the attesting witnesses did sign their names in her presence. The controversy stems around subsections 3 and 4 of § 56–03–02, as to whether or not Erma declared to the witnesses that the instrument was her will, and whether or not Erma requested the witnesses to attest her will.

This court has previously considered the significance of the requirement that the testator must "declare" to the attesting witnesses that the instrument is his will. In *Edwardson v. Gerwien,* 41 N.D. 506, 171 N.W. 101 (1919), the court held that the word "declare" signifies any act on the part of the testator which would show to others that the instrument which the testator signed was his will.

> "In declaring the same to be his will, the testator is not required to do so by words, but he may by other means than the use of words, such as the use of signs, gestures, or any other means by which the testator can convey and make known to the witnesses or others present that the instrument which he signs is his will." 171 N.W. at 102.

This decision was not overturned in any way by the language in the *Stormon v. Weiss* case, *supra,* to the effect that the purpose of requiring that a will be declared and attested to, is so the witnesses will not only view its signing but will be able to also form an opinion as to the testator's mental capacity.

In the instant case, Adeline Bogner, one of the attesting witnesses, testified that Mr. Striebel called her and Betty Striebel and asked if they would come back to witness the signing of a will. Mr. Striebel introduced Erma to Adeline and Betty, "and then he told her that we would be witnessing her signing of this will, and asked if the

will was what she wanted. And she said yes." They watched as Erma signed the will, and then they placed their own signatures upon it as witnesses.

The codicil was executed in Erma's home the next day. Betty Striebel read the codicil to Erma "and she asked her if this was what she wanted, and Mrs. Thomas said yes." Betty and Adeline watched Erma sign the codicil and, before they signed as witnesses, Betty read the attestation clause [2] out loud and Erma said she agreed to it. Betty testified that she and Adeline commented upon leaving about how very neat and clean Erma's house was and how neat she was dressed. "And we even talked about hopefully when we were her age we would be as sharp and alert as she was on that day."

■ Clearly, the requirement that the will and codicil be declared and attested to are met here. Erma, by her words and conduct, made known to the witnesses that the instruments she was signing were her will and codicil, and that she wanted them to act as her witnesses. Further, the purpose behind this requirement was met as her witnesses testified that they were satisfied that Erma was competent to make such will and codicil. The district court's findings of fact are fully supported by the evidence.

As an additional point, the appellants argue that Lawrence, as executor of his father's estate, was in the position of trustee to the other heirs. They contend that, as trustee, Lawrence had a duty to notify them that in quitclaiming their interests to their mother, Lawrence would have the opportunity ultimately to purchase the remaining two quarters of land for $50 an acre as provided in their mother's will. There is no evidence in the record that supports this argument.

The judgment of the district court admitting to probate the Last Will and Testa-

---

**2.** "Signed and acknowledged by Erma Z. Thomas as her Codicil to her Last Will and Testament in our presence, and by us subscribed as attesting witnesses in her presence, at her request, and in the presence of each other this 12th day of January, 1971."

ment and Codicil thereto of Erma Z. Thomas is affirmed.

ERICKSTAD, C. J., and PAULSON, VANDE WALLE and SAND, JJ., concur.