Daniel J. LILL, Plaintiff and Appellant,

v.

CAVALIER RURAL ELECTRIC COOP-ERATIVE, INC., Defendant and Appellee.

Civ. No. 890346.

Supreme Court of North Dakota.

June 1, 1990.

Price and LaQua, Langdon, for plaintiff and appellant; argued by Robert Q. Price.

R. Scott Stewart (argued), Langdon, for defendant and appellee.

GIERKE, Justice.

Daniel J. Lill appeals from a district court judgment which ordered that he pay Cavalier Rural Electric Cooperative, Inc. (Co-op) $1500 for services rendered by the Co-op to reconnect electrical services to his farmstead home. We affirm.

Daniel is the son of Mr. and Mrs. Edward Lill and was reared on his parents' homestead. The farm home was connected to the Co-op's electric distribution system in September of 1951 at the request of Edward Lill. Service to the site was discontinued at the request of Mrs. Edward Lill, then a widow, in November of 1976. The power line to the location was removed in June of 1981 at the request of Mrs. Lill. In 1986, Daniel entered into a contract with his mother to purchase the quarter section on which his parents' homestead had been located. Daniel then notified the Co-op to connect his farmstead home to its electric power distribution system.

The Co-op advised Daniel that when a service connection was disconnected and a member of the same family that requested disconnection asked for a reconnection of the same premises, the cost of disconnection, plus the estimated cost of reconnection would have to be paid to the Co-op before reconnection would be made. Daniel refused to make the payment requested but stipulated with the Co-op that a deposit of $1500 would be made with the Co-op in full payment of his portion of the estimated installation costs pending a judicial decision concerning the validity of the policy of the Co-op and its resulting charges. Thereafter, the Co-op installed the transmission lines to Daniel's home at a net cost of $5,538.[1]

The Co-op's basis for the $1500 advance payment from Daniel was its policy bulletin no. 63, adopted by the Co-op in 1979, which stated in pertinent part:

"If the distribution line is removed and the same party or a member of the same family requests service then that party will be required to pay the cost of labor and overhead on removal plus the estimated labor and overhead on re-installation before the line will again be reconstructed."

Daniel commenced suit against the Co-op contending that the reconnection charges were discriminatory, arbitrary and unjust. The Co-op argued that policy bulletin no. 63 had been applied indiscriminately to three other members of the Co-op under similar circumstances. Further, the Co-op argued that Daniel was treated fairly because service charges to customers needed to be sufficient to pay operating and maintenance expenses together with interest and principal payments on its outstanding debt obligations.

The district court held that the policy was not unreasonable because (1) the policy was not specifically initiated to resolve Mr. Lill's situation, (2) other people, in a situation similar to Mr. Lill's, had paid additional money for reconnection of electrical service, (3) the cost of removal of the line was borne by the Co-op and (4) the line was removed in 1981, five years prior to Mr. Lill's request for reconnection. The court held that although the Co-op's policy was discriminatory in the sense that it singled out a class of individuals for additional charges, there was a rational basis for the classifications based on cost projections for reconnection of the electric service. Further, the court held that while the policy's clause "member of the same family" is somewhat ambiguous, the fact that Daniel was the son of the previous owner together with the short five year time lapse between removal of the transmission line and the

---

1. The actual cost of installing the underground electrical lines to Lill's rural location was $6,338. However, two adjoining landowners agreed to pay $400 each to the Co-op if the lines were installed underground thus reducing the Co-op's cost to $5,538.

request for reconnection was a sufficient basis upon which to validate the Co-op's policy. Thus, the district court held that the Co-op could retain the $1500 deposit previously received from Daniel. This appeal followed.

On appeal, Daniel argues that the Co-op was engaged in the business of a public utility thus subjecting it to laws prohibiting discriminatory, unjust, and unreasonable rules and regulations pertaining to its rates and services to the public. Arguing that the Co-op's policy bulletin no. 63 was discriminatory, unjust and unreasonable, Daniel contends that the district court erred in validating the Co-op's policy bulletin. The Co-op argues that a deposit or minimum length service agreement is required from all customers desiring electrical service from the Co-op whether or not the customer arguably falls under the provisions of policy bulletin no. 63. Thus, the Co-op contends it was reasonable to require Daniel, as a Co-op customer, to partially offset the high construction costs of reconnecting his farm home with electrical service.

On appeal, the issue to be resolved is whether the Co-op's requirement that Lill pay $1,500 for the electrical hookup was discriminatory and unjust.

The Co-op was organized in 1948 under Title 10–13 of the North Dakota Century Code and is financed by the Rural Electrification Administration in Washington D.C. Under North Dakota law, the Co-op is not considered a public utility. Section 49–03–01.5(2), N.D.C.C.[2] In addition to the powers granted by the general law governing electric cooperatives, the Co-op had the power to "fix, regulate, and collect rates, fees, rents, or other charges for electrical energy and other facilities, supplies, equipment, or services furnished by it." Section 10–13–03(8), N.D.C.C. Further, since each electric cooperative is required to be operated without profit to its members, the rates, fees, rents and other charges for electrical energy and for any other facili-

ties, supplies, equipment or services shall be sufficient at all times to (1) "pay all the operating and maintenance expenses necessary or desirable for the prudent conduct of its business and the principal and interest on the obligations issued or assumed by the cooperative in the performance of the purpose for which it was organized" and (2) to create reserves. Section 10–13–05(1), (2), N.D.C.C.

In this case, the evidence reflects that the Co-op would have required a deposit or a minimum length service agreement from *any person* who desired electrical service to the Lill farmstead due to the high costs of the electrical line installation. Mr. Duane Otto, manager of the Co-op, testified as follows when questioned by Lill's counsel at the district court trial:

"Q [Mr. Price—counsel for Lill] If the—if there had been no previous connection of this farm to the REA service, would this deposit have been required under the rules of REA?

"A [Mr. Otto] Depending on the distance involved we may have required a minimum length of service requirement, in lieu of a deposit, depending on the circumstances.

"Q And how is this minimum length deposit determined?

"A That would be determined by whether the line was built underground or overhead and the distance involved and the investment we would have to make to provide that service.

"Q Have you a policy bulletin to that effect?

"A Possibly not. I would have to review the policies but because of the investment that would be required we would consider which way we would go. We may take a deposit with a minimum charged against the deposit. It just depends on the investment."

As is reflected in the above quoted testimony, despite the fact that the Co-op had no written policy with regard solely to electri-

**2.** Section 49–03–01.5(2) of the North Dakota Century Code states:

" 'Rural electric cooperative' shall include any electric cooperative organized under chapter 10–13. An electric cooperative, composed of members as prescribed by law, shall not be deemed to be an electric public utility."

cal connections, the Co-op would have required either a deposit or a minimum length service agreement from any potential customer desiring electricity at the Lill farm location.

Thus, it appears that the only distinction between the Co-op's policy bulletin no. 63 and its regular practice of requiring a deposit or minimum length service agreement for initial electrical hookups is that under policy bulletin no. 63, the customer is obligated to pay for the "cost of labor and overhead on removal" of the previously connected electrical line.

In this case, Lill's payment of $1,500 was to be applied solely towards the Co-op's net *connection* costs of $5,538 rather than towards the sum of the Co-op's disconnection and connection costs as mandated by policy bulletin no. 63. Therefore, it appears that Lill was treated similarly to all potential customers of the Co-op—for initial electrical service hookup, either a deposit must be made or a minimum length service agreement must be entered into with the deposit amount or minimum length service period dependant upon "whether the line was built underground or overhead and the distance involved and the investment we [Co-op] would have to make to provide that service." *See Farmers Union Grain Terminal Ass'n v. Nelson,* 223 N.W.2d 494, 499 (N.D.1974) ("There may be established by the cooperative some minimum business requirements for membership.")

■ In addition to concluding that Lill was treated similarly to any potential customer, we recognize that the Co-op's Board of Directors has the prime responsibility of managing the Co-op. Normally, the good faith acts of corporate directors within the power of the corporation and in the exercise of honest business judgment are considered valid and the courts generally will not interfere with or regulate the conduct of the directors in the reasonable and honest exercise of their judgment and duties where their judgment is uninfluenced by personal consideration. 18B Am Jur 2d Corporations § 1490 (1985). *See also Levandusky v. One Fifth Avenue Apartment Corp.,* 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990) (the business judgment rule prohibits judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.)

■ There is no evidence that the directors of the Co-op made their decisions absent good faith. The Co-op had the power to fix and regulate rates, fees, and other charges for electrical energy at such a level so as to be sufficient to pay all operating, maintenance and debt obligations that it incurred for the *prudent conduct of its business.* Sections 10–13–03(8); 10–13–05(1), (2), N.D.C.C.

Thus, in light of the aforementioned, it appears that the Co-op's Board of Directors acted within their business discretion when they decided to charge Lill with $1,500 of the $5,538 net cost of installing the electrical lines to his rural location. The charge against Lill was not discriminatory because all customers were treated alike and the charge was not unjust because the Co-op had the inherent power to set rates, fees and other charges in such a manner sufficient to operate its business in a prudent manner.

The district court judgment is affirmed in all respects thereby entitling the Co-op to retain Lill's $1,500 deposit.

MESCHKE, Acting C.J., and VERNON R. PEDERSON, Surrogate Justice, concur.

VANDE WALLE and LEVINE, JJ., concur in the result.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.