In the Matter of the CONSERVATOR-
SHIP OF Lloyd Myrl SICKLES, a
Protected Person.

Ralph S. OLIVER, Petitioner
and Appellant,

v.

Kenneth BRAATEN, Conservator,
Respondent and Appellee.

In the Matter of the ESTATE OF
Lloyd M. SICKLES, Deceased.

Ralph S. OLIVER, Personal Representa-
tive of the Estate of Lloyd M. Sickles,
Deceased, Petitioner and Appellant,

v.

Kenneth BRAATEN and First National
Bank North Dakota, Respondents
and Appellees.

Civ. Nos. 930174, 930365.

Supreme Court of North Dakota.

June 15, 1994.

As Amended July 18, 1994.

Gregory C. Larson (argued) of Wheeler Wolf, Bismarck, for petitioner and appellant in Civ. No. 930174.

Michael E. Keller (argued) of the Bergquist Law Firm, Larimore, for petitioner and appellant in Civ. No. 930365.

Michael E. Juntunen (argued) of Hamilton, Juntunen & Cilz, Grand Forks, for respondents and appellees.

LEVINE, Justice.

Ralph S. Oliver appeals from probate court orders that refused to vacate an earlier order, obtained by Kenneth Braaten, the conservator for Lloyd Myrl Sickles, approving the creation of a revocable living trust. We affirm.

For many years, Oliver, a Larimore attorney, handled legal matters for Lloyd and his twin brother, Floyd Earl Sickles. The brothers, who had worked professionally in the performing arts for most of their lives, lived in Larimore and owned a significant amount of real property. The brothers never married and apparently had no living relatives.

In discussing estate planning with Oliver, the brothers wanted the survivor of them to be taken care of during his lifetime, with any remaining assets upon death used to fund theater and art activities in the Larimore area. In 1984, the brothers executed wills which left the other brother as primary beneficiary until his death, with the residue given to a list of charities in the area. In 1988, the brothers executed wills which, except for a gift of "theater property" to the Larimore Community Entertainers, eliminated the specific list of charities. The wills instead created a nonprofit corporation named the Sickles Foundation which was designated as the residuary beneficiary. Oliver was nominated personal representative in the wills.

The articles of incorporation for the Sickles Foundation stated in part:

"The object and purpose of this corporation is to give effect to and to fulfill the wishes of Floyd E. Sickles and Lloyd M. Sickles, Larimore, North Dakota, as expressed in these Articles of Incorporation. Floyd E. Sickles and Lloyd M. Sickles intend to leave their property, upon the death of the survivor of them, to this corporation. Any and all property gifted, bequeathed, and/or transferred to the corporation shall be received and administered by the corporation for religious, charitable, scientific, testing for public safety, literary, or educational purposes. This corporation shall have full power and authority to own said property and to do all things necessary or incident to managing, controlling, and disposing of the same in a manner consistent with its purposes, provided, however, that the powers of this corporation are limited to those which are in furtherance of religious, charitable, scientific, testing for public safety, literary, or educational purposes, as those terms may or shall be defined by Section 501 of the Internal Revenue Code of 1954 of the United States of America, the regulations duly promulgated thereunder or any subsequent acts amendatory or supplementary thereof."

The articles further placed management of corporate affairs with a three-member board of directors appointed "for life" and described as "a self-perpetuating body." Oliver's legal associate, Michael A. Williams, was appointed to the Board. Olive Solseng, Oliver's legal assistant, later was appointed to the Board as secretary for the corporation. Oliver was named the corporation's registered agent. The articles stated that the corporation would have a "perpetual" period of duration.

In early 1992, the brothers, who were in their mid–70s, on several occasions executed new wills and powers of attorney. In March 1992, attorney Richard Olson prepared wills for the brothers which were similar to the 1988 wills, except that they nominated Wendy Stark as personal representative instead of Oliver. Stark had provided housekeeping services for the brothers. In April 1992, the brothers executed new wills prepared by Oliver, keeping the same beneficiaries but renaming Oliver as the personal representative.

By this time, the brothers' health and mental faculties had begun to deteriorate and Stark sought to be appointed conservator for Lloyd. Similar proceedings were brought with respect to Floyd. Stark alleged that Lloyd, because of his advancing age, was unable to cope with the day-to-day management of his real and personal property and other investments, and that the property would be wasted or dissipated unless properly managed. Oliver and James Hougen, a friend of Lloyd, filed objections to the petition. Oliver claimed that he had held powers of attorney for the brothers for 25 years until Stark had them revoked, and herself granted powers of attorney. Hougen stated that he had been granted the most recent powers of attorney for the brothers, that Lloyd was in need of a conservator, and suggested that he be appointed guardian and that Braaten, the Grand Forks County Public Administrator, be appointed conservator. Stark subsequently petitioned for appointment of Braaten as interim conservator, which was granted by the court. Following a hearing in July 1992, the court entered an order appointing Braaten as conservator and limited guardian for Lloyd. Braaten was also appointed conservator and guardian for Floyd.

Braaten then began investigating the brothers' assets and became aware of the Sickles Foundation. Braaten testified:

"Q And did you become aware of it by reading it in the will?

"A No. This came quite early on after I took over the conservatorship. I had heard the word 'Foundation.' I really didn't understand anything about it but ... I received a bank statement to the Sickles Foundation and I took that to Mr. Oliver's office and he said yes that was his. He was going to take care of that. And at the time I asked Mr. Oliver, I said what is the Foundation and he said, 'Well,' he said, 'I really don't know that much about it.' This was prepared by, I believe, a Mike Williams or either a partner or employee in the law firm—Mr. Oliver's law firm. But he's told me that he was no longer in the area, and I believe he said he was in Washington, D.C. and that he was no longer acting as an attorney and that he would

be getting in touch with him and we would talk about it later. That sounded reasonable to me.

"Q What information did you discover about the Foundation?

"A Well, again, later on I asked ... Mr. Oliver ... about if he had heard anything from Mr. Williams or what the Foundation was about and he said at that time—he told me really the Foundation was none of my affair; it was a separate entity; I had nothing to do with it and that actually it really had nothing to do with the Sickles brothers; it was really none of their affair. And that bothered me because I thought—well, I felt it was my concern. I researched it and I felt that under public administrator and conservatorship that I should know something about it, but I didn't question him at the time. But after I had found out I felt that I should know something about it. I asked him a third time and again I asked him, 'Do you feel it's really none of my affair?' and he said, 'Yes, that's the way it is,' and that was the last I talked to him about it."

On November 2, 1992, Braaten petitioned for court creation of a revocable living trust. Braaten argued that Lloyd's physical condition had deteriorated and measures were necessary to provide for his needs and, upon his death, to provide for Floyd's needs. Braaten informed the court that the brothers had expressed a desire to leave any remaining estate assets to charitable organizations and had executed several wills giving the assets to the Sickles Foundation, but that the corporation's attorney, Oliver, refused to provide any information concerning the purpose of the corporation, its management, or its Internal Revenue Service qualification status. According to Braaten, he examined available corporate records and believed the corporation did not provide sound management or direction consistent with Lloyd's wishes. Braaten said that the failure to put the estate assets in a trust would place the estate at risk and would not provide proper tax planning, management, and distribution of income and assets. Braaten later explained that he was also concerned with the execution of two wills nominating different person-

al representatives in a two-month time frame and that he believed the brothers "were just being influenced by whoever they happened to be with at the time. . . ." Oliver was not provided notice of Braaten's petition.

The court approved creation of the revocable living trust on the same day and entered an order approving the gift of real property to the trust on November 12, 1992. Also on November 12, Braaten obtained an order allowing him to gift the "theater property" to the Larimore Community Entertainers.

The terms of the trust approved by the court provided that the income and principal were to be used for support of Lloyd during his lifetime. After Lloyd's death, his estate expenses would be paid and the net income and principal would then be available for Floyd's care. The trust provided that, upon Floyd's death, the income and principal would be paid to the First National Bank North Dakota, as trustee of the Sickles Charitable Trust. The Sickles Charitable Trust provided for charitable disposition of the trust's assets in boilerplate Internal Revenue Service terms similar to those used in the Sickles Foundation's articles of incorporation.

The trust contains a "perpetuities savings clause" stating that the trust "shall not continue beyond, but shall terminate 21 years after the death of the last survivor of Grantor, and any beneficiary named herein and living on the date of this agreement." The trust further provides:

"The Trustee herein, upon termination, dissolution after paying or making provision for payment of all liabilities of the trust, may distribute the remaining assets to such other organization or organizations, organized and operated exclusively for charitable, educational or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code, and to organizations which will undertake and further the goals identified by Grantor to promote the municipality of Larimore, North Dakota, scholarship funds for students of Larimore Public Schools to further their higher education or technical training, to advance the fine arts, music, drama and literary community, and to oth-

erwise sponsor and support such institutions as the Crippled Children's School in Jamestown, North Dakota, the Dakota Boys Ranch, and other organizations which assist, sponsor and maintain facilities and assistance for disadvantaged children, young adults and adults."

With regard to management, the trust states:

"In making any distributions from this trust after the death of Grantor's brother and for charitable purposes setforth [sic] above, the trustee shall create a committee to consider and decide by majority vote, the allocation and amounts and the recipients of distributions. The committee shall consist of: 1.) The Trustee hereof, and; 2.) Superintendent of Larimore School District, and; 3.) The Mayor of Larimore, and; 4.) The President of the Larimore Community Entertainers, and; 5.) one citizen of the city of Larimore, ND, as selected by the majority vote of the other members of the committee. This person to be elected to a three (3) year term, which person can also not serve consecutive terms."

Lloyd's revocable living trust was executed on November 14, 1992, as was the deed transferring Lloyd's property to the trust. Lloyd died the following day, November 15, 1992.

Oliver then moved to vacate the court's order approving the creation of the revocable living trust. After the motion was filed but before the hearing date, the Internal Revenue Service informed the Sickles Foundation that it had received federal tax-exempt status. Although the Sickles Foundation was not made a party, its president and Oliver's former legal associate, Williams, filed an affidavit stating that after the corporation was formed, Oliver said he intended to sell nine quarters of farmland as personal representative of the brothers' estates. Williams stated this would be against the brothers' "general intent and a betrayal of their trust" and "would not be in the best interest of Sickles Foundation, especially because ... Oliver would do it, in my opinion, to place large commissions in his own pocket to the detri-

ment of the estates and [Sickles Foundation]." Williams further stated:

"[Sickles Foundation] realized that it may not ever be funded if, for any number or [sic] reasons, the wills of the Sickles Brothers were changed or the property of Sickles Brothers was otherwise legitimately disposed of in a manner that defeated a funding of [Sickles Foundation]. Any legitimate disposition of Sickles Brothers' property, such as a court-approved trust, or a change in their wills that defeats the funding of [Sickles Foundation] is not objectionable to [Sickles Foundation]. [Sickles Foundation] sees its role as one of a willing recipient from willing donors. If the donors are no longer willing, [Sickles Foundation] accepts that it may not or will not be funded. [Sickles Foundation] does not see its duty as one of somehow fighting to see that it is funded. It does not join ... Oliver's fight for control of Sickles Brothers property."

The court denied Oliver's motion on February 10, 1993. Oliver filed a second motion to vacate as well as a petition as the personal representative of Lloyd's estate asking the court to review and avoid the creation of the revocable living trust. The court denied both motions in separate orders dated September 8, 1993. These appeals followed, and we directed that the conservatorship appeal be consolidated with the estate appeal because both focus on the validity of the trial court's order allowing creation of the revocable living trust.[1]

I

■ Oliver asserts that the trial court erred in determining that he, as the nominated personal representative in Lloyd's last will, was not entitled to notice of Braaten's

petition to create the revocable living trust.[2] We agree.

A court may make gifts in trust exceeding 20 percent of a year's income of the estate only if satisfied, after notice and hearing, that it is in the best interests of the protected person. N.D.C.C. § 30.1–29–08(2)(d) [5–408]. *See also Matter of Conservatorship of Gessler*, 419 N.W.2d 541, 544 (N.D.Ct.App. 1988); II Uniform Probate Code Practice Manual, at p. 532 (2d ed. 1977). Although the statute is unclear as to whom notice must be given [*see* R. Effland, *Caring for the Elderly under the Uniform Probate Code*, 17 Ariz.L.Rev. 373, 406 (1975)], N.D.C.C. § 30.1–29–05(2) [5–405] provides in part that:

"*Notice* of a petition for appointment of a conservator or other initial protective order, and *of any subsequent hearing, must be given* to any person who has filed a request for notice under section 30:1–29–06 and *to interested persons and other persons as the court may direct.*" [Emphasis added].

An "interested person" is defined in N.D.C.C. § 30.1–01–06(21) [1–201] as including:

"heirs, devisees, children, spouses, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person which may be affected by the proceeding. It also includes *persons having priority for appointment as personal representative*, and other fiduciaries representing interested persons. *The meaning as it relates to particular persons may vary from time to time and must be determined according to the particular purposes of, and matter involved in, any proceeding.*" [Emphasis added].

Oliver's claim on appeal that Floyd should have been given notice was presented to the trial court. Even assuming that Oliver can assert Floyd's rights, we deem the argument meritless because Braaten was also appointed conservator and guardian for Floyd and filed a simultaneous petition for creation of a revocable living trust on Floyd's behalf.

---

1. Although this case concerns only the affairs of Lloyd, we have been informed by counsel that Floyd died on August 23, 1993.

2. Oliver also claims on appeal that he should have been given notice as a creditor of Lloyd and that the Sickles Foundation was also entitled to notice. Because these issues were not presented to the trial court, we do not address them. *See, e.g., N.D. Guar. Student Loan Program v. Voigt*, 513 N.W.2d 64, 66 (N.D.1994).

Under the circumstances, we believe that Oliver, as the nominated personal representative in Lloyd's last will, should have been afforded notice of Braaten's petition to create the revocable living trust. Braaten was aware that Oliver had been nominated personal representative and, although Braaten claimed Oliver was uncooperative in divulging information about Sickles Foundation, he nevertheless knew of his association with it as the corporation's attorney. Braaten's knowledge of Oliver's involvement with the corporation takes on added significance because Braaten's petition to create the trust, if granted, would have likely deprived the corporation of the very assets it needed to function. The particular purposes of, and the matter involved in, this proceeding to create the trust necessitated that Oliver be notified as an "interested person" within the meaning of the statute.

But Oliver has already received his remedy for lack of notice of Braaten's petition to create the trust. When interested persons are not given notice, an order entered in the proceeding does not bind them. *Matter of Estate of Ketterling,* 515 N.W.2d 158, 162 (N.D.1994); *Matter of Estate of Hoffas,* 422 N.W.2d 391, 397 (N.D.1988). Rather, they are entitled to be heard on the matter through a motion to vacate or modify the order entered based on the proceeding where notice was defective. *See Matter of Estate of Hoffas; Matter of Estate of Holmes,* 183 Mont. 290, 599 P.2d 344, 347 (1979). Here, Oliver attempted to convince the trial court that the order should be vacated by attacking it through no fewer than three separate proceedings. Oliver was allowed to present evidence at a hearing and has been allowed free reign to advance his theories and position in an attempt to persuade the trial court that an error has been made. Thus, Braaten's failure to provide notice to Oliver is of no consequence under the circumstances.

## II

■ Oliver asserts that, because he was not given notice of the proceedings to create the trust, Braaten's actions were fraudulent. The trial court, noting that Oliver "merely asserts the word 'fraud' and fails to add any

legal support for the assertion of fraud," was "unable to find that [Braaten's] actions in creating the trust were fraudulent."

In a probate proceeding, the circumstances constituting fraud must be plead "with particularity" in accordance with N.D.R.Civ.P. 9(b). *Matter of Estate of Ketterling,* 515 N.W.2d at 165. We have already concluded that Oliver has not been harmed by the lack of notice. *Cf. Olson v. Fraase,* 421 N.W.2d 820, 827 (N.D.1988) [to support legal action or defense, fraud must have produced actual damages]. Given Olson's conclusory allegation, we believe the trial court correctly rejected the claim of fraud.

## III

Oliver asserts that the trial court erred in approving Braaten's petition to create the revocable living trust. We disagree.

■ A court has broad powers to handle the estate and affairs of a protected person. II Uniform Probate Code Practice Manual, at p. 501. Under N.D.C.C. § 30.1–29–08(2)(c) [5–408]:

> "the court has, for the benefit of the person and members of his household, all the powers over his estate and affairs which he could exercise if present and not under disability, except the power to make a will. These powers include, but are not limited to, power to make gifts, ... to create revocable or irrevocable trusts of property of the estate which may extend beyond his disability or life...."

A trial court's decisions regarding management of a protected person's estate will not be reversed on appeal unless there has been an abuse of discretion. *Matter of Guardianship of Renz,* 507 N.W.2d 76, 78 (N.D.1993); *Matter of Conservatorship of Kinney,* 495 N.W.2d 69, 71 (N.D.1993). A trial court abuses its discretion when its decision is not " 'the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.' " *Matter of Conservatorship of Kinney* [quoting *Matter of Altshuler,* 171 Wis.2d 1, 490 N.W.2d 1, 3 (1992) ].

■ The essential difference between a trust and a will is that a trust "acts at once to vest the interest in the beneficiaries, although enjoyment is postponed until the death of the settlor," while a will "does not take effect until death and until then no interest can vest." *Whalen v. Swircin,* 141 Neb. 650, 4 N.W.2d 737, 739 (1942). Nevertheless, a "revocable trust can perform the same function as a will in disposing of the grantor's estate and has certain advantages over the disposition of the grantor's estate by will." Bogert & Bogert, *The Law of Trusts and Trustees* § 264.5, at p. 426 (rev. 2d ed. 1992) [footnote omitted]. Although § 30.1–29–08(2)(c) [5–408] forbids a court from making a will for a protected person, it specifically allows the court to create a revocable trust. This apparent theoretical inconsistency is resolved by N.D.C.C. § 30.1–29–27 [5–427], which directs that in the process of investing the estate and selecting assets for distribution, "the conservator and the court should take into account any known estate plan of the protected person, including his will. . . ." *See also Matter of Conservatorship of Kinney,* 495 N.W.2d at 72; R. Effland, 17 Ariz.L.Rev. at 406. Thus, a commentator has recognized that gifts of unneeded property to a designated beneficiary in a will preserve an estate plan and merely accelerate the transfer that would take place at death. *See* R. Effland, 17 Ariz.L.Rev. at 406. We agree with Oliver that, under the statutory scheme, a court and conservator are not empowered to effectively defeat a protected person's estate plan and intentions set forth in a valid will through the creation of a revocable living trust that depletes the estate that would have otherwise passed to intended beneficiaries.

■ But we disagree with Oliver's contention that this is what occurred here. He asserts that, although the provisions of the trust were "very similar" to the terms of Lloyd's will, because the residuary charitable beneficiary was changed from the Sickles Foundation to the Sickles Charitable Trust, with a different management scheme, there was a "fundamental" change in Lloyd's estate plan. According to Oliver, the trial court's creation of the trust altered Lloyd's known estate plan to such an extent that it consti-

tuted a rewriting of Lloyd's will in violation of the statutory mandate.

The trial court found that Braaten decided to create the trust for three reasons: (1) to insure that there were sufficient assets to provide for the care of Lloyd and Floyd during their lifetime; (2) to insure that any remaining assets would be used for charitable purposes in accordance with Lloyd's intent; and (3) to accomplish these goals in a way that would minimize any adverse tax consequences and make more assets available for charitable purposes. The trial court also found that Braaten, by creating the revocable living trust, carried out, fulfilled, and preserved the goals and objectives of Lloyd's estate plan.

The trust, like the will, provided for the brothers' needs during their lifetimes. Braaten testified that he had reviewed the various wills, found them to be generally consistent, and discussed with Lloyd his desires for use of the property. The trust did not vary the specific intentions of Lloyd.

The record further shows that Braaten was legitimately concerned about adverse tax consequences. Olson testified about his concerns that the total estate would likely exceed the $600,000 uniform transfer tax equivalent. Olson testified that, upon reviewing the brothers' assets, he believed "they would have an estate tax consequence upon the death of the survivor, if the survivor received all of the assets of the brother's, and that was a significant concern because it would certainly reduce the amount available for distribution to the community in support of the Community Entertainers and theater as they had wished. I thought that was counterproductive to what they wanted done."

However, of signal import, we, like the trial court, cannot ignore the uncertainties over the continued vitality of the brothers' intentions for disposition of the assets. When Braaten began investigating the brothers' assets, he found that the Sickles Foundation was surrounded in secrecy, that it was potentially inappropriate for tax purposes, and that it lacked the appearance of independent management. Oliver refused to provide Braaten with the information necessary to

resolve these concerns. Olson, too, could not obtain any information from Oliver about Internal Revenue Service approval of the corporation for tax-exempt status. Oliver was nominated personal representative in Lloyd's will, was the registered agent for the corporation, and, although Oliver was not a member of the board of directors, two of his associates constituted a voting majority of this "self-perpetuating body." One of these associates, the president of the Sickles Foundation, now questions whether Oliver's primary concern is the Sickles brothers' charitable intentions. These circumstances led the trial court to observe:

"Mr. Oliver appears to be upset with the creation of the trust because it relieves him of any future legal work as personal representative. It is clear from the record that Mr. Braaten tried unsuccessfully to work with Mr. Oliver. On several occasions Mr. Oliver claimed that he knew nothing about the Sickles Foundation, although he admits that it was his idea to create it. Mr. Oliver did tell the conservator that he could find out more about the foundation by contacting either the secretary of the foundation or the other member because they were apprised of all of it and knew more about it than he did.... Oliver also testified that he did not have the foundation papers in his possession. However, a copy of the foundation papers is recorded as being sent to his office by Secretary of State Ben Meier on August 18, 1988."

The trial court stated that "[i]t is clear from the testimony and documents on file that Ralph Oliver was fully aware of the estate plan of Lloyd M. Sickles but refused to share the information with Mr. Braaten."

When a court and conservator are faced with circumstances like these, there are sound reasons for preferring a trust over a nonprofit corporation as the legal form for a private charitable foundation. Private foundations are usually formed as either a trust or a corporation and "[f]ederal tax treatment is essentially a neutral factor in the choice of form." C. Clark & G. Troost, *Forming a Foundation: Trust vs. Corporation*, ABA Probate and Property Journal, May–June 1989, at p. 32 [Clark & Troost]; T. Smith, *Trust vs. Corporate Form*, 126 Trusts & Estates 20, 21 (1987) [Smith]. The corporate form appears to be the one most frequently used. *See* Clark & Troost; Smith. "The liability of the charitable manager ... varies with the legal form of the charity and is perhaps the most important factor accounting for the preference of the corporate form...." E. Fisch, D. Freed, and E. Schachter, *Charities and Charitable Foundations* § 147, at p. 143 (1974).

"A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." Restatement (Second) of Trusts § 348 (1959). *See also* IVA A. Scott & W. Fratcher, *The Law of Trusts*, § 348 (4th ed. 1989). On the other hand, a corporation provides "greater protection from liability for the organization's directors and officers because their decisions will be evaluated under the business judgment rule rather than more stringent fiduciary standards." V. Bjorklund, *When is a Private Foundation the Best Option?*, C818 ALI–ABA 199, 209 (1993) [Bjorklund]. It has been suggested that the standard of care included in the Uniform Management of Institutional Funds Act, which North Dakota adopted in 1975 as N.D.C.C. § 15–67–06,[3] embodies the less stringent business judgment standard. *See* Clark & Troost, at p. 34. Under the business judgment rule, corporate directors are shielded "from all liability except for self-

3. N.D.C.C. § 15–67–06 provides:
"*Standard of conduct.* In the administration of the powers to appropriate appreciation, to make and retain investments, and to delegate investment management of institutional funds, members of a governing board shall exercise ordinary business care and prudence under the facts and circumstances prevailing at the time of the action or decision. In so doing, they shall consider long-term and short-term needs of the institution in carrying out its educational, religious, charitable, or other eleemosynary purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends, and general economic conditions."

dealing, willful misconduct or gross negligence." Clark & Troost, at p. 34. *See also Lill v. Cavalier Rural Elec. Co-op.,* 456 N.W.2d 527, 530 (N.D.1990) [recognizing that "the business judgment rule prohibits judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."].

In this case, questionable circumstances surrounded the Sickles Foundation. Oliver refused to divulge information about the foundation, even though there are public disclosure requirements for all charitable organizations. Bjorklund, C818 ALI–ABA at 216. The Internal Revenue Service had not yet given the foundation tax-exempt status, even though the corporation had been in existence for more than three years. The proposed trust provided management independence, while maintaining management control with Larimore area citizens. The trust added certainty to estate tax planning aspects. The trust would further provide savings in time and administrative expenses because no assets would be left to probate. Under these circumstances, the trial court cannot be faulted for approving a legal form for the charitable foundation that imposed a higher, fiduciary role upon management.

The legal form used to achieve Lloyd's charitable purposes was an ancillary aspect of the estate plan. The intended beneficiaries of the brothers' assets were the charitable causes in the Larimore community, rather than the Sickles Foundation itself and the court acted to protect the viability of the brothers' intentions.

We conclude that the trial court did not abuse its discretion in approving the creation of the Sickles Charitable Trust. The orders are affirmed.

NEUMANN and MESCHKE, JJ., concur.

VANDE WALLE, C.J., concurs in the result.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.

VERNON R. PEDERSON, Surrogate Judge, dissenting.

The majority opinion, by adopting a generous view of the statute which grants conservators their authority, has provided for the future an easy remedy for persons that hereafter wish to surreptitiously challenge the validity of a will. The words "except the power to make a will" are not words that grant authority but show a restriction thereof. They should be construed in the light of our long-standing tradition of treating wills with appropriate respect. *See, e.g., Tooz v. Tooz,* 78 N.D. 432, 50 N.W.2d 61 (1951); *Stormon v. Weiss,* 65 N.W.2d 475 (N.D.1954); *Bender v. Bender,* 72 N.W.2d 220 (N.D.1955); *Hoppin v. Fortin,* 111 N.W.2d 122 (N.D. 1961); *Boone v. Estate of Nelson,* 264 N.W.2d 881 (N.D.1978); *In re Estate of Nelson,* 281 N.W.2d 245 (N.D.1979); *In re Estate of Thomas,* 290 N.W.2d 223 (N.D.1980); *In re Estate of Polda,* 349 N.W.2d 11 (N.D. 1984); *In re Estate of Papineau,* 396 N.W.2d 735 (N.D.1986); *In re Estate of Ambers,* 477 N.W.2d 218 (N.D.1991); *In re Estate of Otto,* 494 N.W.2d 169 (N.D.1992) *In re Estate of Ketterling,* 515 N.W.2d 158 (N.D.1994).

It is entirely immaterial to the issues in this case whether or not the conservator found a better and more effective way to get the Sickles brothers' assets delivered to the Larimore-based performing arts activities and whether or not attorney Oliver "appears to be upset ... because it relieves him of any future legal work."

Wills, throughout the country, that were a lot stranger and more questionable than the wills of the Sickles brothers have been consistently protected by the courts from the efforts of "do-gooders" who think they can do better.

The Sickles brothers and their longtime friend and attorney, Ralph Oliver, obviously were not the first people in Grand Forks County to think that a foundation can serve as a significant, prominent and permanent memorial. They undoubtedly knew about *In re Myra Foundation,* 112 N.W.2d 552 (N.D. 1961).

I would reverse and remand for fulfillment of the intent of the Sickles brothers, as clear-

ly spelled out in their wills, unless there is an appropriate challenge of the validity of the wills, and evidence is produced that one of the appropriate grounds for a challenge exists.