2004 ND 40

**John DIXON, Plaintiff and Appellant**

v.

**McKENZIE COUNTY GRAZING ASSOCIATION, Defendant and Appellee.**

**No. 20030005.**

Supreme Court of North Dakota.

Feb. 25, 2004.

Rehearing Denied March 23, 2004.

Charles L. Chapman, Chapman and Chapman, Bismarck, N.D., for plaintiff and appellant.

Dennis Edward Johnson, Johnson & Sundeen, Watford City, N.D., for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] John Dixon appealed from a judgment dismissing his action against the McKenzie County Grazing Association ("MCGA") and awarding MCGA $2,500 in attorney's fees and $4,536.59 in costs. We hold Dixon's claim against MCGA for breach of a fiduciary duty is barred by the statute of limitations, the trial court did not err in finding MCGA acted properly in finding Dixon engaged in 1994 and 1997 unauthorized grazing uses, MCGA had authority to change Dixon's ranch from an inventory to a turn-in headquarters, and the trial court did not abuse its discretion in awarding MCGA attorney's fees and costs. We affirm.

I

[¶ 2] MCGA is a cooperative grazing association organized under N.D.C.C. ch. 36–08 to lease national grasslands in McKenzie County from the federal government and to issue grazing permits to MCGA members. During the 1930s, the federal government purchased grasslands in McKenzie County to revegetate those lands and to stabilize the local economy. On behalf of the federal government, the Forest Service administers those leases with MCGA. The Forest Service and MCGA have adopted Grazing and Management Agreements with rules of management to govern grazing on the grasslands under MCGA's jurisdiction.

[¶ 3] To become a MCGA member and obtain a grazing permit on grasslands under MCGA's jurisdiction, an applicant must either own or lease "base property," which is defined under MCGA's rules of management as "designated property on which a grazing preference was established as original members came into the MCGA. Base property is identified in the MCGA records on the original applications and consisted of both deeded and leased

acres." In 1936, the federal government conducted a survey to determine prior grazing use of the grasslands. The 1936 survey and original base property were used to determine grazing preferences, which confer the right to graze a specified number of cattle for a specified number of months on the federal grasslands. A 1938 grazing agreement between MCGA and the United States required MCGA to classify grazing preferences as either a class A preference for applicants with a priority of use, or a class B preference for applicants without a priority of use. In 1966, MCGA adopted a policy that "[a]ll existing preferences shown on the records of the Association as of June 9, 1966, shall be recognized subject to the rules and regulations of the Association." According to Dixon, MCGA's action "lessened the rights of the original base property owners," and in the early 1990s, MCGA addressed issues about base property and grazing preferences. During this process, the term "phantom rights" was used to refer to grazing preferences not attached to original base property. In 1993, the MCGA executive board issued a report that referred to phantom rights, and voted to accept the report after changing the reference to phantom rights to "the difference between the original rights and today['s] rights."

[¶ 4] In November 1942, Dixon's grandfather applied for reinstatement as a member of MCGA. MCGA's records state the application was for a "back membership" with fees paid for 1940, 1941, 1942, and 1943. MCGA approved the application in 1943. In 1952, MCGA approved an application to change the membership for the Dixon ranch from Dixon's grandfather to Dixon's father, W.D. Dixon. In 1972, W.D. Dixon's membership in MCGA was transferred to the W.D. Dixon Trust. In 1983, MCGA approved an application to change the membership for the Dixon ranch from the W.D. Dixon Trust to W.D.

Dixon, Shirley Dixon, and John Dixon. In 1986, John Dixon began managing the Dixon ranch.

[¶ 5] Since 1943, the grazing preference for the Dixon ranch has been set at 100 animal units on MCGA controlled land, and since the 1950s, the Dixon ranch has been classified as an "inventory headquarters," which is defined under MCGA's rules of management as "[a] ranch headquarters with private and allocated [Forest Service] lands, and on which the total number of animals are limited by the grazing preference."

[¶ 6] In October 1993, MCGA's Unauthorized Use Committee investigated an unauthorized-grazing-use complaint by the Forest Service against Dixon. Under MCGA's rules of management, an unauthorized grazing use means "grazing livestock in excess or deviation of . . . [an] annual permit, whether on headquarters or in a common grazing allotment." An exception to an unauthorized grazing use is allowed "when excess units on inventory headquarters are in connection with normal management practices, i.e. branding, weaning, delay of turnout date, treating sick animals, etc., as long as the National Grasslands is not being abused." According to MCGA's president, MCGA found Dixon had not violated the unauthorized grazing use regulation, because, in addition to his annual permit, he had been issued a temporary permit that allowed him to temporarily have more than the permitted number of livestock on his ranch. According to MCGA's secretary, after the 1993 complaint against Dixon, the Forest Service directed MCGA to "tighten up" how it issued temporary permits, and in 1994, MCGA developed a new form for temporary grazing permits, which was included in minutes sent to MCGA members.

[¶ 7] On December 15, 1994, MCGA's Unauthorized Use Committee investigated an unauthorized-grazing-use complaint by a MCGA member against Dixon. MCGA concluded Dixon had engaged in an unauthorized grazing use in allowing 254 head of cattle over his permitted limit on his inventory headquarters without having been issued a temporary permit. MCGA changed the classification of Dixon's ranch from an inventory headquarters to a turn-in headquarters, which is defined under MCGA's rules of management as "[a] ranch headquarters with no allocated [Forest Service] land and only a summer dependency for the grazing preference." The change in Dixon's headquarters placed the federal land on his headquarters into common grazing area. According to MCGA, a member with an inventory headquarters can graze cattle on common federal land during the summer grazing season, but subjects his private deeded land to MCGA regulations and permit requirements, while a member with a turn-in headquarters can graze cattle on common federal land during the summer grazing season, but does not subject his deeded land to MCGA regulations and permit requirements. According to Dixon, the change in headquarters allowed him to increase his summer grazing on common federal land to 139 animal units, but decreased the size of his headquarters and required him to provide extra feed for the 139 animal units when he was not grazing on common federal land.

[¶ 8] In August 1997, MCGA's Unauthorized Use Committee investigated an unauthorized-grazing-use complaint against Dixon. MCGA concluded Dixon had engaged in a willful, unauthorized grazing use in which his cattle were found in a part of a common grazing pasture where they were not authorized, and MCGA fined Dixon.

[¶ 9] In 1995, Dixon sued MCGA, alleging, among other things, MCGA diluted his grazing preference by issuing grazing preferences to individuals who originally did not own base property, MCGA acted arbitrarily and capriciously in finding him guilty of the 1994 unauthorized grazing use, and MCGA lacked authority to change his ranch from an inventory to a turn-in headquarters. In an amended complaint, Dixon alleged MCGA acted arbitrarily and capriciously in finding him guilty of the 1997 unauthorized grazing use.

[¶ 10] The trial court dismissed some of Dixon's claims before trial, and after a bench trial, the court dismissed Dixon's remaining claims. The court thereafter concluded three of Dixon's claims, which had been dismissed before trial, were frivolous and awarded MCGA $2,500 in attorney's fees for those claims. The court also awarded MCGA $4,536.59 in costs. Dixon appealed, and while his appeal was pending, we temporarily remanded to the trial court for the limited purpose of allowing it to consider Dixon's motion to supplement the record with affidavits by MCGA's president and its attorney from another case. The trial court denied Dixon's motion to supplement the record.

[¶ 11] The trial court had jurisdiction under N.D. Const. art. VI, § 8, N.D.C.C. § 27–05–06, and N.D.R.App.P. 35(a)(3). Dixon's appeal is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

II

[¶ 12] Dixon argues he is a direct beneficiary of the duties MCGA owes its members, and he claims his grazing preference has been diluted because grazing preferences have been extended to individuals who originally did not own base property. He argues "[i]n 1966, when the pre-

ferred status of Class A preferences was diminished, and again in the 1990s when the status of base property was reviewed, the MCGA had a duty to those persons, who were the beneficiaries of the original state law and the original charter, to protect their interest. . . . By *failing to protect* that original interest, the MCGA breached its *duty to the original members* and caused them, including [him], damage."

[¶ 13] The trial court granted MCGA summary judgment on Dixon's claims for breach of a fiduciary duty, concluding MCGA had no fiduciary obligation for transactions between it and an individual member and his claim was barred by the statute of limitations.

■ [¶ 14] Summary judgment is a procedural device for promptly disposing of a claim without a trial if, after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact or inferences that reasonably can be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Tarnavsky v. McKenzie County Grazing Ass'n*, 2003 ND 117, ¶ 7, 665 N.W.2d 18. In *Tarnavsky*, at ¶¶ 10–15, we affirmed a summary judgment dismissing a claim similar to that raised by Dixon. We did not decide whether a six-year or a ten-year statute of limitations governed the action, because we concluded the alleged wrongdoing occurred well outside either statute of limitations. *Id.* at ¶ 14. We said the right to bring a similar claim, if one existed, came into existence when Tarnavsky's predecessors in interest released grazing preferences in the 1940s and no later than 1966 when MCGA eliminated the distinction between class A and class B preferences. *Id.* at ¶ 10. We concluded Tarnavsky was not entitled to any greater rights under the statute of limitations than his predecessors in interest. *Id.* We rejected Tar-

navsky's argument the discovery rule saved his claim, concluding he knew or reasonably should have known of the difference in preferences during the years when he and his predecessors in interest were receiving grazing permits. *Id.* at ¶¶ 11–12. We also rejected Tarnavsky's argument the annual issuance of grazing permits was a continuing wrong. *Id.* at ¶ 13.

[¶ 15] The Dixon ranch has been part of MCGA and has received grazing permits since the 1940s. Dixon's grandfather became a member of MCGA in 1943, his father became a member of MCGA in 1952, and he became a member in 1983. Dixon brought this action against MCGA in 1995. Dixon argues his claim is not barred by the statute of limitations, because he lacked knowledge of the claim until 1993, MCGA's establishment, review, creation, or identification of base property was not completed until 1996, and the annual issuance of grazing permits was a continuing wrong. Those arguments are the same as the arguments we rejected in *Tarnavsky*, 2003 ND 117, ¶¶ 10–14, 665 N.W.2d 18. We hold Dixon's claim about a fiduciary duty and the dilution of his grazing preference is barred by the statute of limitations and by our decision in *Tarnavsky*.

### III

[¶ 16] Dixon argues MCGA acted arbitrarily and capriciously in finding him guilty of the December 1994 unauthorized grazing use and in changing his headquarters from an inventory to a turn-in headquarters. Dixon also argues MCGA acted arbitrarily and capriciously in finding him guilty of the August 1997 unauthorized grazing use.

### A

■ [¶ 17] We initially consider the appropriate standard for review of actions

by MCGA, which is a cooperative grazing association organized under N.D.C.C. ch. 36–08. A grazing association's governing body is subject to the general laws governing directors of cooperatives. N.D.C.C. § 36–08–08. In *Lill v. Cavalier Rural Elec. Coop., Inc.*, 456 N.W.2d 527, 530 (N.D.1990), this Court said the business judgment rule applied to decisions by a cooperative's board of directors:

> Normally, the good faith acts of corporate directors within the power of the corporation and in the exercise of honest business judgment are considered valid and the courts generally will not interfere with or regulate the conduct of the directors in the reasonable and honest exercise of their judgment and duties where their judgment is uninfluenced by personal consideration.

 [¶ 18] We conclude that standard applies to a trial court's consideration of actions by a grazing association. We further conclude a trial court's findings under that standard are reviewable under the clearly erroneous standard of N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *Hogan v. Hogan*, 2003 ND 105, ¶ 6, 665 N.W.2d 672. A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous. *Id.* (quoting *Schmaltz v. Schmaltz*, 1998 ND 212, ¶ 6, 586 N.W.2d 852). On appeal, we do not reweigh conflicts in the evidence. *Center Mut. Ins. Co. v. Thompson*, 2000 ND 192, ¶ 20, 618 N.W.2d 505.

### B

██ [¶ 19] Dixon argues MCGA acted unreasonably in finding him guilty of the December 1994 unauthorized use. He argues he had a reasonable history of experience with MCGA under which the presence of non-permitted excess units on his headquarters had been accepted, and on December 5, 1994, he applied for a temporary permit for 260 extra units. He claims he assumed the temporary permit had been approved, because there was evidence no temporary permit had ever been denied and he had been approved for 170 extra units in 1992 and 176 extra units in 1993. He claims, although MCGA did not approve his application for a temporary permit, the normal business practice exception to excess units applied to his situation. He argues he was not guilty of a willful or intentional trespass in December 1994.

[¶ 20] MCGA's operations manual provides that "[a]ny member grazing livestock in excess or deviation of his/her annual permit, whether on headquarters or in a common grazing allotment, is in unauthorized use." An exception is allowed "when excess units on inventory headquarters are in connection with normal management practices, i.e. branding, weaning, delay of turn out date, treating sick animals, etc., as long as the National Grasslands is not being abused." Under MCGA's operations manual, an Unauthorized Use Committee shall immediately investigate unauthorized use grazing complaints and determine whether the unauthorized use was willful or intentional. If the Unauthorized Use Committee decides an unauthorized use was willful or intentional, the overage shall be removed and the Board will arrange a hearing. If the Board decides "an unauthorized use has been taken and the violator is a member of the MCGA, the Board shall apply the penalty rules." Under MCGA's operations manual, a "[v]iolator shall be assessed five times the MCGA monthly grazing fee per animal for the first five units and ten (10) times the graz-

ing fee per animal for each over five, and/or suspend or revoke the member's or non-member's permit." MCGA's operations manual also provides discretionary authority for MCGA to issue temporary permits.

[¶ 21] The trial court refused to substitute its judgment for MCGA's determination that Dixon engaged in an unauthorized use in December 1994, and the court concluded the normal management practices exception to the excess units rule provided Dixon with no relief. The court decided MCGA acted in good faith in handling the 1994 unauthorized use complaint.

[¶ 22] There is evidence the Forest Service directed MCGA to "tighten up" its procedure for issuing temporary permits after 1993, and MCGA thereafter developed a form for temporary permits with notice to every MCGA member. There is evidence Dixon had 254 cattle over his permitted limit on his inventory headquarters on December 15, 1994, without having been issued a temporary permit. Although Dixon had applied for a temporary permit for 260 animal units on December 5, 1994, MCGA did not approve that permit, and there is evidence an applicant has the responsibility to make sure a temporary permit has been approved. Dixon's December 5, 1994, application for a temporary grazing permit for 260 animal units stated the date "on" was "12/5/94" and the date "off" was "5/15/95," which supports an inference he intended to winter those cattle on his headquarters. There is evidence Dixon continued to haul cattle from a ranch in Oliver County and other non-MCGA controlled land in McKenzie County to his headquarters in McKenzie County after MCGA investigated the complaint on December 15. Although Dixon claims he was going to conduct a pregnancy check on the livestock, there is evidence he had not contacted a veterinarian until after the

livestock had been brought to his headquarters. There is evidence that under the normal ranch practices exception, non-permitted cattle cannot be on an inventory headquarters unless they are in a feedlot, and there is evidence Dixon's non-permitted cattle were on grasslands on his inventory headquarters and not in a feedlot. MCGA implicitly found Dixon had engaged in a willful and intentional unauthorized use when it proceeded to change his headquarters. Although there is some evidence supporting Dixon's claim he did not engage in a willful and unauthorized grazing use in December 1994, there is also evidence supporting a contrary finding. A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous. *Hogan*, 2003 ND 105, ¶ 6, 665 N.W.2d 672. We are not left with a definite and firm conviction the trial court made a mistake in finding MCGA acted in good faith in determining Dixon engaged in a willful and intentional unauthorized grazing use in December 1994. We therefore conclude the trial court's findings are not clearly erroneous.

## C

[¶ 23] Dixon argues MCGA acted unreasonably by changing his ranch from an inventory to a turn-in headquarters as a result of the December 1994 unauthorized use. He argues the normal punishment for an unauthorized use is a monetary fine.

[¶ 24] The trial court decided MCGA was authorized to change Dixon's ranch from an inventory to a turn-in headquarters as a permissible sanction for the 1994 unauthorized use. Section 36–08–02(3), N.D.C.C., authorizes a grazing association to "[a]pportion to members grazing rights within its district on such terms, conditions, and limitations ... as may be specified by the board of directors of the association." Under N.D.C.C. § 36–08–08(1)

and (2), the directors of a grazing association may regulate and apportion grazing rights within the district. The directors may create grazing subdivisions in the district and determine the length of time a member may graze specified stock in a subdivision. N.D.C.C. § 36–08–08(3) and (4). The directors also may suspend or expel any member for refusing to abide by or conform to the rules and regulations of the association or its directors. N.D.C.C. § 36–08–08(10). MCGA's articles of incorporation authorize it to apportion a member's grazing rights on such terms, conditions, and limitations as specified by the directors and to do everything necessary and proper for the accomplishment of its objectives or conducive to the benefit of the association. Under MCGA's operations manual, MCGA and the Forest Service must jointly "[t]ake appropriate and timely action against unauthorized livestock use." MCGA members agree to "[c]omply with the By-laws, Rules of Management, policies and allotment management plans of the MCGA," and a member's grazing preference and annual permit may be suspended, revoked, or canceled for failure to comply with those provisions, including excess numbers. MCGA's operations manual also provides that for unauthorized grazing use, a "[v]iolator shall be assessed five times the MCGA monthly grazing fee per animal for the first five units and (10) times the grazing fee per animal for each over five, and/or suspend or revoke the member's or non-member's permit."

[¶ 25] Those provisions authorize MCGA to fine, suspend, or revoke a member's grazing permit for an unauthorized grazing use. MCGA did not impose a sanction as severe as suspending or revoking Dixon's grazing permit. Rather, MCGA changed Dixon's ranch from an inventory headquarters to a turn-in headquarters, which was within the range of sanctions MCGA could have imposed. We conclude the foregoing provisions authorized MCGA to change Dixon's ranch from an inventory to a turn-in headquarters. We further conclude there is evidence to support MCGA's decision to change Dixon's headquarters, and the trial court's findings on this issue are not clearly erroneous.

D

[¶ 26] Dixon argues MCGA acted arbitrarily and unreasonably in finding him guilty of a willful unauthorized grazing use in August 1997. He argues the evidence indicates the 1997 unauthorized use was neither willful nor intentional, and a fine was not warranted.

[¶ 27] The trial court said MCGA's finding of a willful trespass by Dixon in August 1997 was based on circumstantial evidence. The court, however, declined to substitute its judgment for MCGA's and found the greater weight of the evidence supported MCGA's determination Dixon committed a willful or intentional trespass, because he had a duty to keep his cattle in the appropriate unit of a common pasture. There is evidence some of Dixon's permitted cattle were found in a part of a pasture where they were not supposed to be in August 1997. There is evidence a MCGA member is responsible for keeping livestock in the correct part of a pasture. There also is circumstantial evidence Dixon's cattle had been in a part of the pasture where they were not supposed to be for a considerable period of time. The circumstantial evidence supports an inference the August 1997 unauthorized use was willful. The trial court acknowledged the evidence was largely circumstantial and found the unauthorized use was willful. We do not reweigh conflicts in the evidence. *Thompson*, 2000 ND 192, ¶ 20, 618 N.W.2d 505. We conclude the trial

court's findings on the August 1997 unauthorized use are not clearly erroneous.

## IV

[¶ 28] Dixon argues the trial court erred in awarding MCGA $2,500 in attorney's fees. The court dismissed several of Dixon's claims before trial, and the court thereafter found three of those claims were frivolous. The court found count four, which alleged MCGA attempted to coerce Dixon into accepting a change in the status of his grazing permit; count six, which alleged MCGA participated in a conspiracy to restrain Dixon from making lawful and legitimate use of his property in violation of N.D.C.C. ch. 51–08.1; and part of count seven, which alleged damage to Dixon's business reputation, were frivolous. The court said there was such a complete absence of actual facts or law that no reasonable person could have thought a court would enter judgment in his favor as to those three claims, and the court awarded MCGA a total of $2,500 in attorney's fees, with $1,000 allocated to count four, $1,000 allocated to count six, and $500 allocated to count seven.

[¶ 29] Under N.D.C.C. § 28–26–01(2), a court may, in its discretion, upon finding a claim for relief is frivolous, award reasonable attorney's fees to the prevailing party. A claim is frivolous when there is such a complete absence of actual facts or law that a reasonable person could not have expected the court to render a judgment in that party's favor. *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 84 (N.D.1991). Although a trial court's award of attorney's fees for frivolous claims should not chill enthusiasm and creativity in pursuing factual legal theories, a court's award of attorney's fees is discretionary and will be upheld if the court has not abused its discretion. *Id.* at 84–85. A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a reasoned decision, or it misinterprets or misapplies the law. *Olander Contracting Co. v. Gail Wachter Inv.*, 2003 ND 100, ¶ 8, 663 N.W.2d 204.

[¶ 30] Dixon argues his "case has tested the authority of a North Dakota Grazing Association to alter his grazing rights, both by his claim that grazing permits have been issued to unqualified property owners and by his concern over the forced alteration of his headquarters. These are claims of first impression and thus do not touch settled law in North Dakota."

[¶ 31] MCGA claimed it incurred $49,922.34 in attorney's fees for the entire action; however, the trial court found only three of Dixon's claims were frivolous and awarded MCGA $2,500 in attorney's fees for those three claims. We conclude the court's award and allocation of $2,500 in attorney's fees for those three claims was the product of a rational mental process and was not arbitrary, unreasonable, or unconscionable. We therefore conclude the court did not abuse its discretion in awarding MCGA $2,500 in attorney's fees.

## V

[¶ 32] Dixon argues the trial court erred in awarding MCGA costs for photocopies, a binder used for trial exhibits, postage, long distance telephone calls, costs to retrieve tax returns that were not used at trial, and the unsubstantiated cost of a search of his records by the Forest Service.

[¶ 33] Under N.D.C.C. § 28–26–06(2), disbursements shall be taxed as part of the judgment in favor of the prevailing party for necessary expenses for procuring evidence necessarily used or obtained for

use at trial. The allowance of costs and disbursements to a prevailing party under N.D.C.C. § 28–26–06 lies within the sound discretion of the trial court, and its decision will not be overturned on appeal absent an abuse of discretion. *Huber v. Oliver County*, 1999 ND 220, ¶ 22, 602 N.W.2d 710; *Patterson v. Hutchens*, 529 N.W.2d 561, 566–68 (N.D.1995); *Richter v. Jones*, 378 N.W.2d 209, 213 (N.D.1985).

[¶ 34] Dixon asserts he asked for receipts for certain disbursements but his request was rejected. In *Huber*, 1999 ND 220, ¶ 23, 602 N.W.2d 710, we said receipts and personal attestation were not required for costs under N.D.R.Civ.P. 54(e). The trial court was in a better position than this Court to determine the reasonableness and necessity of costs sought by MCGA. *See Richter*, 378 N.W.2d at 213. We conclude the trial court did not abuse its discretion in awarding MCGA costs for the items contested by Dixon.

## VI

[¶ 35] Dixon argues the trial court erred in denying his motion to supplement the record with affidavits by MCGA's president and its attorney in a non-related case in federal court. Dixon's claims essentially relate to materials he asserts were not provided to him during discovery for this case. Discovery decisions are addressed to a trial court's discretion and will not be reversed on appeal absent an abuse of discretion. *Matter of Estate of Schmidt*, 1997 ND 244, ¶ 7, 572 N.W.2d 430 (quoting *In re Estate of Murphy*, 554 N.W.2d 432, 440 (N.D.1996)). We are not persuaded the trial court abused its discretion in denying Dixon's motion to supplement the record.

## VII

[¶ 36] We affirm the judgment dismissing Dixon's claims against MCGA.

[¶ 37] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.