2004 ND 80

**Robert KELLER, Plaintiff and Appellee,**

v.

**Mildred BOLDING, individually and as Trustee of the Kamrath Family Trust, Defendant and Appellant.**

**No. 20030221.**

Supreme Court of North Dakota.

April 13, 2004.

Ronald A. Reichert, Reichert & Herauf, P.C., Dickinson, for plaintiff and appellee.

James D. Gion, Gion Law Office, Regent, for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Mildred Bolding, individually and as Trustee of the Kamrath Family Trust appealed from a judgment entered in Robert Keller's action for intentional interference with his farm lease contract. We conclude the trial court's findings that Bolding wrongfully terminated Keller's lease and that Keller was entitled to recover $20,000 for lost profits are not clearly erroneous. We affirm.

I

[¶ 2] On November 1, 1999, Keller leased from Bolding farmland he had previously leased from Bolding's parents for 16 years. The lease covered 402 acres, of which 343 were subject to cultivation, specified a term running from December 1, 1999, and ending December 1, 2002, and fixed an annual cash rent of $7,000. The lease, which was copied from the one Keller had with Bolding's parents, (1) required Keller "to well and faithfully till and farm the same in a good and farmer-like manner, according to the usual course of good husbandry" according to specified terms and conditions; (2) provided that Keller was to leave 100 acres of summer fallow at the end of the lease or pay $10 for each acre less than 100 or receive $10 for each acre over 100 acres; (3) provided Keller "may not sub-lease the cultivated

acreage"; and (4) provided Bolding could terminate the lease if Keller should "fail to do and perform any of the conditions of this lease."

[¶ 3] Bolding observed hunters on the land on October 17, 2001, and met with Keller the next day. On October 19, 2001, Bolding gave Keller a written notice terminating the lease "effective immediately, based upon your failure to control noxious weeds, [and] to faithfully till and farm . . . in a good and farmer-like manner." That same day, Bolding executed a habitat agreement with Cannonball Company and placed no hunting signs on the land.

[¶ 4] Keller sued, alleging, in part, that "Bolding terminated the Lease so that she and other family members could share in the income from the property, especially the hunting fees and income," and that Bolding's recision of the lease was an intentional interference with his contract. Bolding answered the complaint, denying the lease was terminated to share in income from the property and denying interference with Keller's contract. Bolding also counterclaimed, alleging, in part:

3. In the late summer of 2001, the Trust, through Bolding as Trustee, became aware of the Plaintiff's fee hunting operation being conducted upon the described property.

. . . .

6. Upon reviewing the leased property, an infestation of noxious weeds was noted, as well as unharvested grain left standing, both in contravention of the terms of the lease.

7. Bolding met some unknown hunters when she went to look at the property on or about October 18. In a discussion with the hunters, she was informed by them that the Plaintiff was charging each hunter a fee of $150.00 per day per gun.

8. Bolding scheduled a meeting with the Plaintiff to discuss the problems with his operation, of the property and his fee hunting operation, but the Plaintiff refused to address the basic concerns of Bolding.

9. The actions of the Plaintiff were in violation of the terms of the lease in that the Plaintiff failed to "faithfully till and farm the same in a good and farmer-like manner according to the usual course of good husbandry."

10. The Plaintiff's fee hunting operation was in violation of paragraph 4(C) of the lease which prohibited the sublease of any of the cultivated acreage. In addition, the fee hunting operation was beyond the scope of the agreement in that the lease was for agricultural purposes. The Plaintiff thereby converted the use of the property for hunting purposes to his own uses.

[¶ 5] On April 4, 2002, the trial court granted Keller's motion for partial summary judgment, explaining:

Since the lease fails to address hunting, it is subject to the general rule and the plaintiff, as tenant, had the right to control the hunting upon the land which he possessed pursuant to a lease.

[¶ 6] After a trial, the trial court found Bolding wrongfully terminated Keller's lease and found Keller was entitled to recover damages of $20,000 for lost profits. Judgment was entered accordingly, and Bolding appealed.

[¶ 7] The trial court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

■ [¶ 8] Bolding contends the trial court failed to address her contention "that the reason for termination of the lease was Keller's breach of the provision requiring Keller, in the course of good husbandry, to control noxious weeds."

[¶ 9] Mildred Bolding testified: (1) on October 17, 2001, she saw hunters on the land; (2) "after we were explained to about the hunting program that had started in the last few years and it had become big business then we were concerned as the time went on"; (3) Keller was charging for hunting on the land and "we thought that was subletting the land"; (4) Cannonball Hunting paid Bolding $15 per bird after Bolding cancelled Keller's lease; (5) she issued a notice of cancellation of the lease on October 19, 2001, "because there were people out on the land that we didn't feel had the right to be out there"; (6) "we also ... saw all those weeds that were out in there and the land had not been farmed"; (7) at a meeting on October 18, Keller said he had not sprayed for weeds; (8) there were Canada thistles along the creek, the farmland, and the fence, and there were other weeds; (9) "that termination was for the way the crop land looked with all the noxious weeds on the land"; (10) "when we got out there we saw the condition of the ground, we saw the weeds that were at least two-combine widths wide all the way along the sides of the property, the grain was still standing out there, the ground looked like it hadn't been tilled, the weed[s] were just all over the place"; (11) "the farming should have been in a good farmer like way"; and (12) leaving some grain lying around would be a good thing to do if you are trying to raise pheasants.

[¶ 10] Keller testified: (1) he has had fee hunting the last ten years; (2) to make the land suitable for hunting, he planted food plots, and he fed birds in the winter-time; (3) he left grain unharvested; (4) pheasants like thistle, which is habitat for them, and they eat part of the thistle; (5) wheat is habitat for pheasants; (6) his 5-year average profit was $20,763; (7) he never received any complaints from the weed board or neighbors while he rented the land from the Trust; (8) he sprayed for weeds in 2001; (9) he collected insurance proceeds in years he had no crop; and (10) he made more money in dry years than in others.

[¶ 11] Dale Wegh testified: (1) he rented the land for $8,040 and started farming it in 2002; (2) he farms other land nearby and was familiar with the land; (3) about 90 to 100 acres were infested with Canada thistle; (4) he sprayed the land twice for Canada thistle; (5) he sprays all his land for Canada thistle every year, and it is his practice to spray twice a year; (6) there was standing grain on the land when he took it over; (7) land generally rents for $28 to $32 per tillable acre in the area; (8) he would pay $28 per acre for this land; and (9) his lease on this land contains no restrictions on the manner of cropping, does not require any insurance, and has no summer fallow requirement.

[¶ 12] There was testimony that Keller planted food plots to make the land suitable for hunting, that Keller left grain standing for pheasants, that Canada thistle was growing on the farm, that pheasants like thistle, which is habitat for them, and that pheasants eat part of the thistle. Keller testified he did not receive any complaints from neighbors or the weed board while he rented the farm from the Kamrath Family Trust. The tenant now farming the land testified he farms other nearby land and was familiar with this land before he rented it. The new tenant also testified he does not allow hunting on the land, he sprays all his land for Canada

thistle, and it is his practice to spray twice a year.

[¶ 13] Construing the lease provisions requiring Keller "to well and faithfully till and farm the same in a good and farmer-like manner, according to the usual course of good husbandry," the trial court found:

First, I am convinced that where no lease language prevents or reserves it, the lessee has the absolute right to hunt game and charge others for the privilege. Secondly, the restrictive lease language quoted above does not necessarily prevent lessee from engaging in farming practices designed to foster and nurture a thriving pheasant population. Raising ringneck roosters and raising wheat need not be mutually exclusive even though the vigorous pursuit of one might inhibit or retard the other. Rather, it is finding that balance of both to which rooster/wheat producers aspire. It appears to me that the plaintiff strove to achieve just that balance. He could have farmed more vigorously, i.e., from fence line to fence line, but that would have destroyed the natural cover for wildlife, and a food source as well. The phrase "good-husbandry" includes preventing waste, augmenting production and adapting the land use so as to not deplete its production capacity. I find that is what the plaintiff did.

[¶ 14] We presume the trial court considered the evidence presented to it. *Olson v. Olson*, 2000 ND 120, ¶ 7, 611 N.W.2d 892. From our review of the record, we conclude the trial court considered the evidence in light of Bolding's contention that Keller's failure to control noxious weeds breached the good husbandry provisions of the lease. Further, we conclude the trial court found that Keller practiced good husbandry.

[¶ 15] "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made." *Dixon v. McKenzie County Grazing Ass'n,* 2004 ND 40, ¶ 18, 675 N.W.2d 414. Under N.D.C.C. § 63–01.1–01, it is "the duty of every person in charge of or in possession of land in this state … to eradicate or to control the spread of noxious weeds on those lands." Under N.D.C.C. § 63–01.1–02(3), " '[c]ontrol' means to prevent the spread of any noxious weed." Under N.D.C.C. § 63–01.1–02(7), " '[e]radicate' … means to destroy a plant." Section 7–06–01–02(2) of the North Dakota Administrative Code declares Canada thistle is a noxious weed. Thus, it is against the public policy declared by our legislature for one in possession of land to willfully fail to destroy or prevent the spread of Canada thistle on land in the person's possession. We conclude, therefore, the trial court's finding that Keller practiced good husbandry was induced by an erroneous view of the law and is clearly erroneous.

### III

[¶ 16] Bolding contends terminating the lease was the only reasonable remedy for Keller's breach of good husbandry.

[¶ 17] Bolding testified she saw hunters on the land on October 17, 2001, met with Keller on October 18, 2001, and issued a notice of cancellation of the lease on October 19, 2001, "because there were people out on the land that we didn't feel had the right to be out there." Bolding also testified "that termination was for the way the crop land looked with all the noxious weeds on the land." The court found that "abruptly and summarily fir[ing]" Keller "as a renter" was a "wrongful termination of his interest in the leasehold," which entitled Keller to recover

damages. "Whether a party has breached a lease is a finding of fact." *Peterson v. Front Page, Inc.*, 462 N.W.2d 157, 158 (N.D.1990). "A trial court's findings of fact on appeal are presumed to be correct, and the complaining party bears the burden of demonstrating a finding is clearly erroneous." *Akerlind v. Buck*, 2003 ND 169, ¶ 7, 671 N.W.2d 256.

[¶ 18] "Equity and the law abhor forfeitures." *Ehrman v. Feist*, 1997 ND 180, ¶ 16, 568 N.W.2d 747. We do not favor forfeitures under leases:

"Whether a contract should be canceled for breach depends upon the facts of each case." Forfeitures of estates under leases are not favored. "A condition involving a forfeiture must be interpreted strictly against the party for whose benefit it is created." "[T]he granting of relief against forfeitures is one of the most favored heads of equity jurisdiction."

*Helm Bros., Inc. v. Trauger*, 389 N.W.2d 600, 603 (N.D.1986) (citations omitted). We have held that before a court will order forfeiture for breach of an implied covenant, " 'the lessor must first give notice of the breach and demand that the terms of the implied covenant be complied with within a reasonable time.' " *Ridl v. EP Operating Ltd. P'ship*, 553 N.W.2d 784, 788 (N.D.1996) (quoting *Olson v. Schwartz*, 345 N.W.2d 33, 40 (N.D.1984)). Although this is an expressed condition, not an implied covenant, we have held, "[a] contract cannot be arbitrarily terminated under a provision authorizing termination." *Fargo Foods, Inc. v. Bernabucci*, 1999 ND 120, ¶ 12, 596 N.W.2d 38. Viewing the evidence and the trial court's finding that "abruptly and summarily fir[ing]" Keller "as a renter" was a "wrongful termination of his interest in the leasehold," which entitled Keller to recover damages in that light, we are unable to conclude Bolding has met her burden to establish that the finding is clearly erroneous.

## IV

[¶ 19] The trial court found Keller's lost farm profit for the last year of the lease:

Cross-examination suggests some minor flaws in [Keller's] calculation of the five-year average so I will adjust his numbers downward somewhat and thereby find and conclude that [Keller] is entitled to $20,000 in lost profits from his small grain production for the final and deprived year of the lease.

Because Keller had no written records from his hunting operation, the court found profits too speculative, and did not award any damages for lost hunting income.

[¶ 20] Bolding contends the trial court erred in determining the amount of damages Keller should recover for wrongful termination of his lease, arguing the evidence was uncertain and there were flawed calculations.

[¶ 21] Evidentiary imprecision on the amount of damages does not preclude recovery. As this Court said in the syllabus in *North Am. Pump Corp. v. Clay Equip. Corp.*, 199 N.W.2d 888, 891 (N.D.1972):

6. Where damages obviously have been suffered and there is no definite evidence available for an exact determination of the amount of damages resulting from a breach of contract, the best evidence which the circumstances will permit is all the law requires.

7. The uncertainty which prevents recovery of damages is the uncertainty of the fact of damages, not the uncertainty of the amount. Where it is reasonably certain that substantial damages have resulted, mere uncertainty as to

the exact amount will not preclude recovery.

"In a case where the amount of damages may be hard to prove, the amount of damages is to be left to the sound discretion of the finder of facts." *B.W.S. Investments v. Mid–Am Restaurants, Inc.,* 459 N.W.2d 759, 764 (N.D.1990).

[¶ 22] A trial court's determination of the amount of damages caused by a breach of contract is a finding of fact subject to the clearly erroneous standard of review. *Wachter v. Gratech Co., Ltd.,* 2000 ND 62, ¶ 17, 608 N.W.2d 279. "We do not reverse the trial court's factual findings merely because we may view the evidence differently, and a choice between two permissible views of the weight of the evidence is not clearly erroneous." *Krank v. Krank,* 2003 ND 146, ¶ 6, 669 N.W.2d 105. "In reviewing findings of fact, we give due regard to the trial court's opportunity to assess the credibility and observe the demeanor of the witnesses." *Wagner v. Wagner,* 2000 ND 132, ¶ 12, 612 N.W.2d 555. We view the evidence in the light most favorable to the findings, and we do not reweigh evidence or reassess credibility if there is evidence to support the trial court's findings. *Eberhardt v. Eberhardt,* 2003 ND 199, ¶ 5, 672 N.W.2d 659.

[¶ 23] Keller testified his five-year average profit was $20,763. He also testified he made more money in dry years, when he collected insurance proceeds, than in others. Keller testified 2000 was a drier year, and he estimated, "in a conservative manner," that his loss for 2002 was $25,000. Bolding testified that when she cancelled the lease, she understood "Keller would not be able to receive any profit from farming that land for the year 2002."

It is clear that "damages obviously have been suffered," *North Am. Pump Corp.,* 199 N.W.2d at 891, Syllabus ¶ 6, from Bolding's wrongful termination of the lease, although the amount of damages is not mathematically certain.

[¶ 24] As in *Hopkins v. McBane,* 427 N.W.2d 85, 95 (N.D.1988), our review has left us unable to give a safe ground upon which we can say that the damage award is so excessive as to justify our interference with it. From our review, we conclude there is evidence to support the trial court's finding that Keller was entitled to $20,000 in lost profits resulting from the wrongful termination of his lease. We are not left with a definite and firm conviction a mistake has been made in making that finding, which is presumed correct, and Bolding has not met her burden of overcoming the presumption of correctness we accord to the trial court's finding of fact. We therefore conclude the trial court's finding of $20,000 in lost profits is not clearly erroneous.

## V

[¶ 25] The judgment of the trial court is affirmed.

[¶ 26] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.