2008 ND 117

**RED RIVER WINGS, INC.,**
Plaintiff and Appellee

v.

**HOOT, INC., Defendant and Appellant.**

Richard H. Walstad, Hoadley Harris, David Butler, and John Boulger, All individually and on behalf of Canadian Wings Investment Limited Partnership, and Hoadley Harris and David Butler individually and on behalf of Manitoba Wings Investment Limited Partnership, Plaintiffs, Appellees, and CrossAppellants

v.

Curtis H. Kesselring and Dennis D. Leno d/b/a ME Investments, L.L.P., and Hoot, Inc., Louis Emerson, Arthur Stern, Jerry Baldwin, Patricia Corwin, Clinton L. Emerson, Jill Baldwin, Patricia Corwin Trust, Clinton L. Emerson Trust, Defendants, Appellants, and Cross–Appellees

and

Corwin–Wilson Management, Neil Clark, John Fercho, Mike Rufer, Data Enterprises, Wings Unlimited and Red River Wings, Inc., Defendants

Hoot, Inc., as general partner in Canadian Wings Investment Limited Partnership and Manitoba Wings Investment Limited Partnership, and Louis A. Emerson, Clinton L. Emerson, Clinton L. Emerson Trust, Patricia Corwin, Patricia Corwin Trust, Jill S. Baldwin, Jerry J. Baldwin, Arthur Stern and M.E. Investments, LLP, as derivative action limited partners in Canadian Wings Investment Limited Partnership and/or Manitoba Wings Investment Limited Partnership, Plaintiffs, Appellants, and Cross–Appellees

v.

Thomas M. Lavelle, Red River Wings, Inc., David Dziedzic, Dyan K. Dockter, and Shelly J. Dockter, Defendants and Appellees

and

LTM, Inc., LTM, Inc., d/b/a LTM, Ltd., Defendants, Appellees, and Cross–Appellants

and

Canadian Wings Investment Limited Partnership and Manitoba Wings Investment Limited Partnership, Nominal Defendants.

Nos. 20070087, 20070088, 20070089.

Supreme Court of North Dakota.

June 20, 2008.

Bruce H. Carlson, McNair, Larson & Carlson, Ltd., Fargo, N.D., for appellees Thomas M. Lavelle, Red River Wings,

Inc., Dyan K. Dockter, Shelly J. Dockter, Wings Unlimited and Data Enterprises and appellee and cross-appellant LTM, Inc.

Ronald H. McLean (argued) and Timothy G. Richard (appeared), Serkland Law Firm, Fargo, N.D., for appellees and cross-appellants Richard H. Walstad, Hoadley Harris, David Butler, and John Boulger, Canadian Wings Investment Limited Partnership, and Manitoba Wings Investment Limited Partnership.

Timothy R. Thornton (argued), Jonathan P. Schmidt (appeared) and Timothy G. Gelinske (on brief), Briggs & Morgan, P.A., Minneapolis, MN, and Patrick R. Morley (appeared), Morley Law Firm, Ltd, Grand Forks, N.D., for appellants and cross-appellees Curtis H. Kesselring and Dennis D. Leno d/b/a ME Investments, L.L.P., and Hoot, Inc., Louis Emerson, Arthur Stern, Jerry Baldwin, Patricia Corwin, Clinton L. Emerson, Jill Baldwin, Patricia Corwin Trust, and Clinton L. Emerson Trust.

KAPSNER, Justice.

[¶1]   A majority of limited partners in two limited partnerships appeal from a judgment awarding damages and attorney fees to the minority of the limited partners in the limited partnerships and dismissing the majority's claims against persons and entities involved in a business dispute over two Hooters franchise restaurants in Canada.   A former general partner of the limited partnerships and its principals have cross-appealed from the judgment. We affirm in part, reverse in part, and remand for further proceedings.

A

[¶2]   Thomas M. Lavelle is a Fargo restauranteur who owns and manages restaurants through LTM, Ltd. ("LTM"), a corporation whose only shareholder is La-velle.   Dyan Dockter and Shelly Dockter are employed by the company and they oversee LTM's management duties.   In the mid 1990s, Lavelle learned from Arthur Stern, who worked in the restaurant equipment supply business and had a long-standing business relationship with La-velle, that Hooters of America was looking to expand into Canada and there was the potential to acquire a Hooters franchise there.   Hooters of America approved La-velle as a franchisee, but as a condition for getting a first franchise in Edmonton, Alberta, Lavelle had to purchase options for three additional franchises in Calgary, Alberta;   Winnipeg, Manitoba;   and Banff, Alberta.   The franchise fee for the first restaurant was $75,000, plus a $10,000 non-refundable fee for each of the additional option locations.

[¶3]   Because of the expenses involved and the business risks, Lavelle decided to find investors and sought advice from a friend and retired securities broker, Louis Emerson.   Emerson suggested a limited partnership as the best entity to finance and organize the venture and said he believed he could find a sufficient number of investors in the Fargo area.   Emerson also recommended an attorney to draft the necessary legal documents.   The attorney prepared a private placement memorandum for Canadian Wings Investment Limited Partnership ("Canadian Wings") and Lavelle formed Red River Wings, Inc. ("Red River Wings"), to serve as the general partner.   The private placement memorandum informed potential investors that LTM would provide management services for the restaurants.   Ownership units in Canadian Wings were offered for $80,000 per unit, and Emerson sold ten units to various investors.   Many of the investors, including Richard Walstad, John Boulger, Hoadley Harris and the Harris Trust, David Butler, and ME Investments, LLP

("ME Investments"), a limited liability partnership formed by Curtis Kesselring and Dennis Leno, invested primarily because of Lavelle's reputation and involvement in the business. For their services, Stern and Emerson received fees and profits-only interests as special limited partners.

[¶ 4] Lavelle was required by the West Edmonton Mall and Hooters of America to open the first Canadian restaurant as soon as possible. In order to meet the deadline, Lavelle borrowed money to construct the Edmonton Hooters restaurant. Kesselring and Leno did not make their investment, through ME Investments, until August 1996, one month after the restaurant had opened. The Edmonton restaurant was profitable from the beginning and the limited partners received healthy returns on their investments.

[¶ 5] Under the Hooters of America franchise agreement, the option for a second Hooters restaurant in Canada had to be exercised within six months of the opening of the Edmonton restaurant. In December 1996, Lavelle offered to all partners in Canadian Wings the opportunity to invest in Manitoba Wings Investment Limited Partnership ("Manitoba Wings"), a partnership formed to own a Hooters restaurant in Winnipeg. Manitoba Wings was structured in the same manner as Canadian Wings, but the offering price per unit was $56,000 because of lower occupancy costs in Winnipeg. Emerson and Stern undertook their same roles in exchange for profits-only special limited partner interests. Emerson was unable to sell all of the units, however, and Data Enterprises, a partnership consisting of Lavelle and Dyan Dockter, and Wings Unlimited, a partnership consisting of Lavelle, Dyan Dockter, and Shelly Dockter, purchased two of the units to complete the initial offering. ME Investments, David Butler,

and Hoadley Harris Trust also purchased units. Lavelle again borrowed money and advanced funds for the construction of the Winnipeg restaurant. Manitoba Wings opened the Winnipeg restaurant in March 1997 shortly before the 1997 Red River flood and in the face of bad pre-opening publicity. Nevertheless, the investors received returns on their investment, but less than the returns from the Edmonton restaurant.

[¶ 6] In spring 1998, Stern became disturbed with Lavelle over projects other than the Edmonton and Winnipeg Hooters restaurants. Stern was upset that he was not hired as a consultant for the remodeling of one of Lavelle's restaurants in Billings, Montana, and was unhappy with Lavelle's offer regarding his involvement in the development of a Hooters restaurant in Calgary. Stern sent faxes to several of the partners accusing Lavelle of dishonesty. Meanwhile, Lavelle's relationship with Emerson was also becoming strained. Emerson informed Lavelle that he had no investor prospects for the Calgary Hooters restaurant, and Lavelle decided to not use Emerson as the broker. Kesselring and Leno were also pressuring Emerson because the distributions from Manitoba Wings were not meeting his projections.

[¶ 7] ME Investments, Emerson, Stern, Jerry Baldwin, Jill Baldwin, Patricia Corwin, and Clinton Emerson held a majority of the interests in the limited partnerships. Because the majority limited partners were dissatisfied with the performance of the Winnipeg restaurant, a meeting was held in May 1998 and their concerns were addressed by an accountant. In summer 1998, the majority limited partners hired a certified public accountant to investigate the financial records of Canadian Wings and Manitoba Wings, but no evidence of wrongdoing was found. The majority limited partners were not

satisfied with the report and decided to take over the management of the two partnerships. They consulted with a law firm about removing Red River Wings from the partnerships and installing a new general partner. At the suggestion of Stern, they also contacted Texas Wings, a company that managed many Hooters restaurants in the United States, about taking over the management duties of LTM. The law firm responded that if Red River Wings was removed as the general partner, the limited partnerships would terminate unless a substitute general partner was appointed in accordance with N.D.C.C. § 45–10.1–47.

[¶ 8] On October 25, 1998, the majority limited partners, through written action and without notice to minority limited partners, removed Red River Wings as the general partner of the two limited partnerships and appointed Hoot, Inc. ("Hoot"), as the replacement general partner. Hoot was a corporation formed by Kesselring and Leno for the sole purpose of serving as the replacement general partner for the limited partnerships. The majority partners also terminated the management contracts the partnerships had with LTM. Lavelle, who was aware of the majority partners' dissatisfaction, offered to amend the partnership agreements by changing the distribution allocations between the limited partners and the general partner which would have been financially beneficial to the limited partners. Lavelle's offer was not received until the day after the takeover, and the majority partners refused to reverse their decision to oust Red River Wings and LTM from the partnerships and the business ventures. The minority limited partners, which included Walstad, Boulger, Harris, and Butler, protested the takeover.

[¶ 9] After executing the written action disposing of Red River Wings as the general partner, Stern and a representative of Texas Wings traveled to Edmonton to physically take control of the Canadian Wings restaurant. At the same time, Emerson and Swede Stelzer, the sole officer, director, and shareholder of Hoot and an employee of Kesselring and Leno, traveled to Winnipeg to take over the Manitoba Wings restaurant. The majority partners had made prior arrangements with the landlords and locksmiths for the physical takeover. Stern's expenses were paid by the partnerships.

[¶ 10] Texas Wings performed poorly as the manager of the Edmonton and Winnipeg Hooters restaurants. After Hoot became the general partner, the limited partners did not receive distributions from Canadian Wings for almost two years, and the limited partners received no distributions from Manitoba Wings for almost three years. Within less than one year, Texas Wings voluntarily terminated its services after Stelzer informed Texas Wings of the limited partners' dissatisfaction with its poor performance. The majority partners, without input from the minority partners, hired UD Consulting to manage the Edmonton and Winnipeg restaurants.

[¶ 11] The majority partners eventually sued Lavelle, Red River Wings, LTM, Shelly Dockter, Dyan Dockter and others in federal court seeking damages allegedly caused by Lavelle and his group. After the majority partners spent more than two years in litigation and about $350,000 in fees and costs, the federal court in 2002 dismissed the lawsuit without prejudice for lack of standing. On October 3, 2002, the majority partners voted to continue the lawsuit against Lavelle as a partnership claim and for the partnerships to assume the costs of the prior and future litigation. Minority partners objected, but those objections were ignored.

[¶ 12] The minority partners responded by seeking a temporary restraining order in state court to prevent the majority partners from taking the funds from the partnerships. The district court issued a restraining order against Hoot, and eventually appointed a receiver for both Canadian Wings and Manitoba Wings. Hooters of America was reluctant to deal with the receiver because of the majority partners' actions. The majority partners removed Red River Wings as the general partner without obtaining the required consent of Hooters of America, and Canadian Wings, under the majority partners' control, had sued Hooters of America. Hooters of America demanded from the receiver that any franchise must involve Lavelle and the only general partner it would accept must involve Lavelle. However, the majority partners refused to compromise, and Hooters of America terminated the franchises with Canadian Wings and Manitoba Wings and issued the franchises to Lavelle. The remaining assets of the partnerships, including their equipment, inventory, and liabilities, were purchased by Lavelle in a sale approved by the district court. The partnerships were liquidated and the receivership terminated.

[¶ 13] Three cases, which were consolidated for trial, arose from this scenario. The minority limited partners, consisting of Walstad, Harris, Butler, and Boulger, sued the majority limited partners derivatively and individually for breach of the partnership agreements and breach of fiduciary duties, and sought dissolution and an accounting of the partnerships. The majority partners, consisting of Hoot, Emerson, Clinton Emerson, Corwin, Jill Baldwin, Jerry Baldwin, Stern, and ME Investments, refiled their dismissed federal court action against Red River Wings, LTM, Lavelle, and his associates in state court. Lavelle, through Red River Wings, also sued Hoot, the replacement general partner, for damages for wrongfully withholding distributions.

[¶ 14] Following a lengthy bench trial, the district court awarded damages to the minority group and Lavelle from the majority group for breach of fiduciary duties and awarded them a partial award of attorney fees. The court dismissed the majority partners' claims against Red River Wings, LTM, Lavelle, and his associates. The court also awarded LTM and Lavelle damages for services provided up to the date of the takeover against the majority partners and Hoot. These appeals followed.

II

[¶ 15] Relatively early in these proceedings, the district court in December 2002 granted a partial summary judgment holding as a matter of law that Canadian Wings and Manitoba Wings were dissolved on October 25, 1998, when the majority partners voted to remove Red River Wings as the general partner. The majority partners argue the court ignored the partnership agreements and limited partnership law in ruling the limited partnerships were dissolved unless unanimous approval was given by all limited partners to have Hoot appointed to serve as the successor general partner.

[¶ 16] Summary judgment is a procedural device for promptly resolving a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Superior, Inc. v. Behlen Mfg. Co.*, 2007 ND 141, ¶ 6, 738 N.W.2d 19. Whether a grant of summary judgment was proper is a question of law reviewed de novo by this Court. *Hsu v. Marian Manor Apartments, Inc.*, 2007 ND 205, ¶ 7, 743 N.W.2d

672. This dispute involves interpretation of the limited partnership agreements. A contract is interpreted to give effect to the mutual intentions of the parties at the time of contracting. N.D.C.C. § 9–07–03. The mutual intention of the parties to a contract is to be ascertained from the writing alone, if possible. N.D.C.C. § 9–07–04. Unambiguous contracts are particularly amenable to summary judgment. *Hsu*, at ¶ 8.

[¶ 17] The limited partnership agreements provided in relevant part:

13. *Dissolution, Liquidation, Winding Up, Withdrawal and Removal of General Partner.*

13.1 *Removal of General Partner.* Fifty-one percent (51%) in aggregate investment interest of the Investor and Profits Interest Limited Partners, in a special meeting of said Limited Partners, may remove and terminate the General Partner for any reason, with or without cause. The General Partner's interest in the profits and distributions of the Partnership shall not be extinguished or otherwise affected by the election of a new General Partner(s). In the event of the removal of a General Partner, the Partnership shall have the right to acquire the interest of the former General Partner upon terms and conditions agreed to or established by an independent appraiser, whose determination shall be subject to court review as to fairness and final approval.

13.2 *Dissolution.*

(a) The Partnership shall be dissolved upon the first to occur [of] the following:

(i) Subject to Sections 13.3 and 13.7 hereof, an event of withdrawal (as defined under North Dakota law) of the General Partner; . . .

(c) At any time, the Limited Partners holding at least fifty-one percent (51%) of the Interests then held by all Limited Partners may elect to take any one or more of the following actions:

(i) remove the General Partner with or without cause effective as of the later of (A) the date notice of such election is given as provided in this paragraph (c) below, (B) such later date as may be specified in such notice or (C) upon the final resolution of any dispute, as provided in this paragraph (c) below; or

Any election referred to in clause (i) above shall be made in writing and shall be effective when notice of such election, in the form of a copy (or counterparts) of such election executed by fifty-one percent (51%) or more in interest of the Limited Partners, is given to the General Partner.

13.3 *Resignation, Dissolution or Bankruptcy of General Partner.* The General Partner shall have the right to resign from the Partnership at any time upon 60 days' notice to the Limited Partners. The resignation, dissolution or bankruptcy of the General Partner shall dissolve the Partnership unless within 90 days after notice of such event is delivered to the Limited Partners, 51% in aggregate investment interest of the Limited Partners agree in writing to continue the business of the Partnership and appoint a successor General Partner. In the event that the Limited Partners so agree to continue the Partnership, the interest of the former General Partner shall be terminated in accordance with Sections 13.2 and 13.7.

■ [¶ 18] The partnership agreements provide in section 13.1 that 51 percent "in aggregate investment interest" of the partners "may remove and terminate the General Partner for any reason, with or without cause." Section 13.1 does not address replacing a general partner. The majority partners had the authority to re-

move Red River Wings as the general partner with or without cause under the agreements. Under section 13.3, the "resignation, dissolution or bankruptcy of the General Partner shall dissolve the Partnership unless within 90 days after notice of such event is delivered to the Limited Partners, 51% in aggregate investment interest of the Limited Partners agree in writing to continue the business of the Partnership and appoint a successor General Partner." Red River Wings did not resign, was not dissolved, and was not the subject of a bankruptcy proceeding. Section 13.3 does not address the situation where the general partner is removed by a vote of the limited partners. Under section 13.2(a)(i) of the agreements, the partnerships "shall be dissolved upon ... an event of withdrawal (as defined under North Dakota law) of the General Partner."

[¶ 19] At the pertinent times in this case, limited partnerships were governed by the provisions of former N.D.C.C. ch. 45–10.1, rather than the provisions of N.D.C.C. ch. 45–10.2. Section 45–10.1–26(3), N.D.C.C., provided "a person ceases to be a general partner of a limited partnership upon the happening of any of the following events: ... The general partner is removed as a general partner in accordance with the partnership agreement." This event occurred when the majority partners voted to remove Red River Wings as the general partner under the terms of the partnership agreements. Section 45–10.1–47(4), N.D.C.C., provided that "[a] limited partnership is dissolved and its affairs must be wound up upon the happening of ... [a]n event of withdrawal of a general partner unless ... within ninety days after the withdrawal, all partners agree in writing to continue the business of the limited partnership and to the appointment of one or more additional general partners if necessary or desired."

It is undisputed that only the majority partners, not all of the partners, agreed in writing to the appointment of Hoot as the replacement general partner within 90 days after Red River Wings was removed as the general partner.

[¶ 20] The terms of the partnership agreements and the relevant statutes are clear and unambiguous. The district court correctly concluded that unanimous written consent of all of the limited partners to appoint a new general partner was required within 90 days of the majority partners' removal of Red River Wings to avoid dissolution of the limited partnerships and that unanimous consent was not acquired. However, we disagree with the district court's conclusion that the limited partnerships were dissolved on October 25, 1998. Under the partnership agreements, the majority partners acted within their rights by removing Red River Wings on October 25, 1998, with or without cause. Under N.D.C.C. § 45–10.1–47(4), the majority partners had 90 days after October 25, 1998, to avoid dissolution by acquiring the written consent of all of the limited partners. Therefore, dissolution of the partnerships occurred not on October 25, 1998, but on January 23, 1999, when the 90–day period expired.

[¶ 21] We conclude the district court did not err in granting summary judgment and declaring that Canadian Wings and Manitoba Wings were dissolved as a matter of law because of the majority partners' actions, but we conclude the date of dissolution was January 23, 1999, rather than October 25, 1998.

### III

[¶ 22] The majority limited partners raise numerous arguments in support of their contention that the district court

erred in holding them liable for breach of fiduciary duties.

### A

[¶ 23] The majority partners argue they cannot be held liable under the circumstances of this case because of N.D.C.C. § 45–10.1–22(1), which provided in relevant part:

[A] limited partner is not liable for the obligations of a limited partnership unless the limited partner is also a general partner or, in addition to the exercise of the limited partner's rights and powers as a limited partner, the limited partner participates in the control of the business. However, if the limited partner participates in the control of the business, the limited partner is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner.

The majority partners claim that under this statute a limited partner can be liable only if the limited partner participated in control of the business, and that liability is limited to third parties who transacted business with the limited partnership reasonably believing that the limited partner was the general partner.

■ [¶ 24] We reject the majority partners' argument. This Court has said that "in a limited partnership, general partners, with unlimited liability, manage the business; limited partners contribute only investment capital without participating in the business and without liability beyond capital contributed." *Pear v. Grand Forks Motel Assocs.*, 553 N.W.2d 774, 780 n. 2 (N.D.1996). However, N.D.C.C. § 45–10.1–22(1) does not address fiduciary duties owed to a partnership and to limited partners, but addresses only the liability of a limited partner for the "obli-gations of a limited partnership." Fiduciary duty claims are not obligations owed by the partnership. Section 45–10.1–27, N.D.C.C., retained fiduciary responsibilities by providing "a general partner of a limited partnership has the rights and powers and is subject to the restrictions and liabilities of a partner in a partnership without limited partners." Section 45–16–04, N.D.C.C., sets forth the standards of a partner's conduct:

1. The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections 2 and 3.

2. A partner's duty of loyalty to the partnership and the other partners is limited to the following:

   a. To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

   b. To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

   c. To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

3. A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

4. A partner shall discharge the duties to the partnership and the other partners under chapters 45–13 through 45–21 or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

5. A partner does not violate a duty or obligation under chapters 45–13 through 45–21 or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

*See also Pear,* at 780 n. 2 ("In a limited partnership, a general partner has obligations, powers, and rights like those of a partner in a regular partnership"). The statute imposes upon partners the duties of loyalty and care and the obligations of good faith and fair dealing.

[¶ 25] Other courts have similarly indicated that limited partners who participate in the business of the partnership or act in concert with the general partner are subject to the fiduciary duties of loyalty and care and the obligations of good faith and fair dealing applicable to partners in a general partnership. *See In re Villa West Assocs.,* 193 B.R. 587, 593 (Bkrtcy.D.Kan. 1996) (although limited partner is like corporate shareholder who does not, solely by virtue of his interest in partnership, become a fiduciary to other limited partners, fiduciary responsibility develops when one takes a role in management and acts to dominate, interfere with, or mislead others in exercising their rights); *Welch v. Via Christi Health Partners, Inc.,* 281 Kan. 732, 133 P.3d 122, 139–40 (2006) (recognizing majority limited partners owe fiduciary duty to minority limited partners under some circumstances); *Anthony v. Padmar, Inc.,* 320 S.C. 436, 465 S.E.2d 745, 752 (App.1995) ("relationship of [limited] partners is fiduciary and partners are held to high standards of integrity in their deal-

ings with each other," and "[p]arties in a fiduciary relationship must fully disclose to each other all known information that is significant and material").

■ [¶ 26] In *Svihl v. Gress,* 216 N.W.2d 110, 111 Syll. 1 (N.D.1974), this Court stated:

The conduct of partners during liquidation as well as during any transaction connected with the formation or conduct of the partnership is governed by a fiduciary duty which requires every partner to act with the utmost good faith and integrity in the dealings with one another with respect to partnership affairs . . . .

This Court has further recognized that a partner has a fiduciary duty of loyalty to the partnership and other partners. *Akerlind v. Buck,* 2003 ND 169, ¶ 26, 671 N.W.2d 256. Fiduciary duties and obligations exist between limited partners and a general partner. *See Sandvick v. LaCrosse,* 2008 ND 77, ¶¶ 15–16, 747 N.W.2d 519.

### B

[¶ 27] The majority limited partners argue the district court erred in ruling they breached their fiduciary duties.

■ [¶ 28] Whether a person has breached a fiduciary duty is a finding of fact subject to the clearly erroneous rule under N.D.R.Civ.P. 52(a). *Akerlind,* 2003 ND 169, ¶¶ 26–27, 671 N.W.2d 256. A finding of fact is clearly erroneous under N.D.R.Civ.P. 52(a) if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, this Court is left with a definite and firm conviction a mistake has been made. *Intercept Corp. v. Calima Fin., LLC,* 2007 ND 180, ¶ 12, 741 N.W.2d 209.

[¶ 29] Here, the district court found "[l]imited partners Emerson, Stern, Kesselring and Leno ... were acting in concert with Hoot," "Emerson and Stern were deeply involved with the takeover and with the restaurant operation after the takeover," "Kesselring and Leno ... controlled Hoot ... and acted in concert by way of their controlling actions through the purported general partner," and "[i]nstalling Hoot ... as general partner for both partnerships and running the partnerships under their own terms was a breach of the [majority] defendants' fiduciary duties to the minority partners." The court found the majority limited partners breached their fiduciary duties based on: 1) their "reckless action" of terminating the management contracts for both partnerships; 2) their knowledge that termination of the management contract with LTM would pose potential liability; 3) their "affirmative action to dominate and interfere with the partnership[s]" by taking them over and installing Hoot, a shell corporation controlled by Kesselring and Leno, as a general partner; 4) their authorizing reimbursement to the majority partners for attorney fees and expenses incurred in the federal litigation against Lavelle and his companies; 5) their causing the loss of the Hooters franchise and thereby significantly reducing the value of the two restaurants; 6) their refusals to cooperate with the court-appointed receiver; and 7) their taking these actions without calling meetings as required by the partnership agreements.

[¶ 30] From our review of the record, we cannot say the district court's findings of fact are clearly erroneous. The evidence reflects that the majority group planned a takeover of the limited partnerships and proceeded to do so in a reckless manner. They sought legal advice for the takeover from Kesselring and Leno's attorneys, but failed to secure unanimous consent for a new general partner after having been advised that unanimous consent was necessary. Emerson and Stern attempted to find reasons to remove Lavelle and his companies from the limited partnerships and traveled to the restaurants to accomplish the takeover. The majority disposed of Red River Wings without the required notice or consent of Hooters of America and later sued the franchiser. They hired two replacement management companies, Texas Wings and UD Management, without notice or a vote of all of the limited partners. After the takeover, Kesselring and Leno directly controlled Hoot, and Emerson and Stern were directly involved in controlling the partnerships. Hoot has no assets, no employees, and no separate office, and Stelzer, its sole officer, director, and shareholder, acted on behalf of and at the direction of his employers, Kesselring and Leno. Kesselring and Emerson's control of the partnerships was obvious to Lavelle and the minority limited partners, who dealt directly with Kesselring and Emerson after the takeover in an attempt to resolve the disputes. The majority limited partners authorized reimbursement from the limited partnerships for attorney fees and expenses in the federal lawsuit. Moreover, after the district court appointed a receiver for the limited partnerships, the majority limited partners continued to refuse to surrender control, forcing the receiver to seek a court order to gain control of the partnerships' Canadian bank accounts. The majority limited partners were ultimately held in contempt of court.

[¶ 31] We conclude that the district court's findings that the majority limited partners took control and dominated the partnerships for their own interests and in doing so violated the fiduciary duties of

good faith, fair dealing, loyalty, and care are not clearly erroneous.

## C

[¶ 32] The majority limited partners argue the district court erred in holding them personally liable because the court failed to perform an "entity piercing analysis." They contend the court was required to "pierce the limited partnership veil" before Stern, Emerson, and ME Investments could be held individually liable.

[¶ 33] The majority partners are incorrect in their assertion that the "limited partnership veil[s]" of Canadian Wings and Manitoba Wings needed to be "pierced" in order to hold Stern, Emerson, and ME Investments individually liable. This Court has held in the context of a close corporation, that minority shareholders are entitled to bring a direct action against majority shareholders for breach of fiduciary duties. *See Schumacher v. Schumacher*, 469 N.W.2d 793, 798–99 (N.D.1991). Likewise, the majority limited partners who controlled or acted in concert with the general partner in this case can be held personally liable to the minority limited partners for damages for breach of fiduciary duties. *See, e.g., Anthony*, 465 S.E.2d at 755. Emerson, Stern, and ME Investments, through Kesselring and Leno, clearly participated in the takeover and installation of Hoot as the general partner, which the district court found "was an affirmative action to dominate and interfere with the partnership[s]."

[¶ 34] We also are not persuaded by the majority partners' argument that Kesselring and Leno cannot be held personally liable because ME Investments was actually the limited partner in the partnerships. ME Investments, a limited liability partnership, was the vehicle used by Kesselring and Leno to invest in Canadian Wings and Manitoba Wings. It is obvious from the district court's decision that the court believed ME Investments to merely be the alter ego of Kesselring and Leno because the court refers to the limited liability partnership and the individuals as being one and the same. Principles for piercing a corporate veil apply to limited liability partnerships. *See* N.D.C.C. § 45–22–09(1). To apply the alter ego doctrine, "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist," and "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 836 (2000); *see also Axtmann v. Chillemi*, 2007 ND 179, ¶¶ 12–15, 740 N.W.2d 838; *Jablonsky v. Klemm*, 377 N.W.2d 560, 563–67 (N.D.1985); *Hilzendager v. Skwarok*, 335 N.W.2d 768, 774–75 (N.D.1983). Given the evidence of Kesselring and Leno's participation in the takeover and their direct control and actions in concert with Hoot through their employee, Stelzer, we agree with the district court's implicit finding that it would be inequitable if Kesselring and Leno's acts were treated as those of the limited liability partnership alone. We conclude that the district court did not err in holding Kesselring and Leno individually responsible under these circumstances.

## D

[¶ 35] The majority limited partners also argue Kesselring and Leno's actions are protected by the business judgment rule.

[¶ 36] In the analogous context of corporations, this Court has noted " 'the business judgment rule prohibits judicial inquiry into actions of corporate di-

rectors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *In re Conservatorship of Sickles*, 518 N.W.2d 673, 681 (N.D.1994) (quoting *Lill v. Cavalier Rural Elec. Co-op.*, 456 N.W.2d 527, 530 (N.D.1990)). "'Normally, the good faith acts of corporate directors within the power of the corporation and in the exercise of honest business judgment are considered valid and the courts generally will not interfere with or regulate the conduct of the directors in the reasonable and honest exercise of their judgment and duties where their judgment is uninfluenced by personal consideration.'" *Dixon v. McKenzie County Grazing Ass'n*, 2004 ND 40, ¶ 17, 675 N.W.2d 414 (quoting *Lill*, 456 N.W.2d at 530). "Under the business judgment rule, corporate directors are shielded 'from all liability except for self-dealing, willful misconduct or gross negligence.'" *In re Conservatorship of Sickles*, 518 N.W.2d at 680–81 (citation omitted).

[¶ 37] Although Kesselring and Leno claim they acted in good faith and exercised honest business judgment, the district court's findings reflect the majority group's actions were reckless, were undertaken in bad faith, and were for the purpose of furthering the group's own perceived interests. Evidence supports the court's finding that the majority partners acted recklessly by installing Hoot as the general partner on a majority vote after being advised that unanimity was required and by terminating LTM's management contracts without cause after being advised that cause was necessary. Bad faith is evidenced by the court's finding that the majority partners' reasons for the removal of Red River Wings and termination of the LTM management contracts were concocted after the fact to justify their actions. The majority partners' refusal to relin-

quish control of the limited partnerships to the court-appointed receiver and their attempt to use the partnerships' assets to finance the failed federal court action also evidence bad faith. The court specifically found Kesselring, Leno, Emerson, Stern, and Hoot "were acting in what they believed to be their own best interest or for their own reasons when they removed [Red River Wings] and LTM and ran the partnerships through Hoot, Inc., an entity that Kesselring and Leno controlled." We conclude these findings are supported by the evidence in the record and render the majority group's reliance on the business judgment rule unavailing.

IV

[¶ 38] The majority limited partners contend the district court erred in dismissing their claims against Lavelle, Red River Wings, LTM, and Dyan and Shelly Dockter for breach of fiduciary duty, breach of contract, and fraud.

[¶ 39] The majority partners attempted to establish at trial that Lavelle and Red River Wings breached fiduciary duties by "plundering partnership property and opportunities, such as the future restaurant options and calendar sales," by "wrongfully inflat[ing] the rent guarantee compensation and ma[king] an unapproved $109,000 advance to an unrelated restaurant," by "commingling funds," by "conducting partnership affairs capriciously and inconsistently with the limited partners' reasonable business expectations," and by taking "advantage of the partners in bad faith by usurping significant profits derived from the calendars and the franchise option opportunities." The majority limited partners asserted Lavelle and Red River Wings breached both partnership agreements and Manitoba Wings' subscription agreement "by failing to secure 51% limited partner approval for the sale

of calendars and transfer of franchise options," by "failing to make the required 1% capital contribution," by "commingling funds," and by "taking more than $80 as compensation for the rent personal guarantee." They asserted Lavelle and Red River Wings committed fraud by "not disclosing [Canadian Wings'] ownership of the options and appropriating the options for [their] own gain," by "inducing investors to enter into a subscription agreement based upon the representation that [Red River Wings] would make the required capital contribution," and by "agreeing to be paid $80 per month for guaranteeing the rent but in fact taking $800 per month."

[¶ 40] The district court found "[t]here was no credible evidence to support these claims." Lavelle and Red River Wings presented evidence that partnership investor funds were accounted for and spent for partnership purposes, that the calendar proceeds benefitted the partnerships, and that the majority group never attempted to sell the options. There was no evidence the late payment of the general partner's 1% investment caused any losses to the partnerships. The task of weighing the evidence and judging the credibility of witnesses belongs to the trier of fact, and we do not reweigh credibility or resolve conflicts in the evidence. *McKechnie v. Berg*, 2003 ND 136, ¶ 19, 667 N.W.2d 628. We conclude the district court's finding is not clearly erroneous and the court did not err in dismissing these claims.

## V

[¶ 41] The majority group contends the district court erred in calculating damages.

[¶ 42] Section 32–03–20, N.D.C.C., provides that "[f]or the breach of an obligation not arising from contract, the measure of damages, except when otherwise expressly provided by law, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." "In the breach of a partnership contract by wrongful dissolution, the damages recoverable include the value of the profits which the plaintiff otherwise would have received, or the value to him or her of the continuance of the agreement during the term provided by contract, meaning the prospective or anticipated profits of the partnership, or the profits that would have accrued to the injured partner had the partnership not been wrongfully dissolved." 59A Am.Jur.2d *Partnerships* § 358, at p. 448 (2003) (footnotes omitted); *see also Karrick v. Hannaman*, 168 U.S. 328, 337, 18 S.Ct. 135, 42 L.Ed. 484 (1897) ("A partner who assumes to dissolve the partnership, before the end of the term agreed on in the partnership articles, is liable, in an action at law against him by his copartner for the breach of the agreement, to respond in damages for the value of the profits which the plaintiff would otherwise have received"). Damages for lost profits are recoverable when they are reasonable and not speculative. *Langer v. Bartholomay*, 2008 ND 40, ¶ 27, 745 N.W.2d 649. "Evidentiary imprecision on the amount of damages does not preclude recovery." *Keller v. Bolding*, 2004 ND 80, ¶ 21, 678 N.W.2d 578. The amount of damages to which a party is entitled is a question of fact, and this Court will not reverse the district court's finding on damages unless that finding is clearly erroneous. *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 28, 730 N.W.2d 841. This Court will sustain an award of damages if it is within the range of the evidence presented to the trier of fact. *Id.*

[¶ 43] The district court awarded derivative damages under N.D.C.C. § 45–10.1–59 based on an analysis by the minority limited partners' expert witness who calcu-

lated the reasonable profits and distributions that could have been realized if the majority limited partners had not breached their fiduciary duties and dissolved the partnerships. The expert witness looked at the prior performance of the partnerships, projected future profits based on that performance, and calculated the value of the partnerships on a per unit basis as of the date of the takeover on October 25, 1998. The expert witness calculated the per unit value of the partnership as of October 1998, and calculated the actual damage as of the date of trial to be $188,036 per unit in Canadian Wings and $147,685 per unit in Manitoba Wings. Because the partnerships had been dissolved and liquidated, the district court performed an accounting to award the minority limited partners their individual damages. *See Ritter, Laber and Assocs. v. Koch Oil, Inc.*, 2004 ND 117, ¶ 31, 680 N.W.2d 634 (court may assume jurisdiction for an accounting if there is a basis for equitable jurisdiction). Before deducting the per unit share of the balance remaining in the court-appointed receiver's account, the district court awarded the following damages to the minority limited partners in Canadian Wings: David Butler, $94,018; John Boulger, $188,036; Hoadley Harris/Harris Trust, $188,036; and Richard Walstad, $94,018. The court awarded the following damages to the minority limited partners in Manitoba Wings: David Butler, $147,685; Hoadley Harris Trust, $73,842.50; Data Enterprises, $73,842.50; and Wings Unlimited, $221,527.50.

■■■■■ [¶ 44] We cannot say the method used to determine damages for lost profits was unreasonable and speculative. However, we agree with the majority limited partners that the damages should have been valued 90 days after Red River Wings was removed as the general

partner in the partnerships on October 25, 1998. As we have concluded, the limited partnerships were dissolved as a matter of law on January 23, 1999, rather than on October 25, 1998. Valuation of partnership interests should be as of the date of dissolution. *See Lonning v. Kurtz*, 291 N.W.2d 438, 439–40 (N.D.1980); 68 C.J.S. *Partnership* § 345 (1998). We therefore reverse the award of damages and remand for a determination of the damages resulting from the dissolution of the limited partnerships on January 23, 1999.

## VI

[¶ 45] The majority limited partners argue the district court erred in awarding Red River Wings its distributions from Hoot because Red River Wings did not fulfill its obligation under the partnership agreements to contribute 1 percent of the total capital raised by the partnerships.

[¶ 46] In addressing this issue, the district court found:

> While [Red River Wings] did not make a timely payment of its one (1) percent contribution to [Manitoba Wings] this was *de minimis* and for most of the period of time the one (1) percent was outstanding, considerably more money than the one (1) percent was owed to [Red River Wings], Lavelle or LTM by [Manitoba Wings]. There was no evidence that the delay in booking the one (1) percent contribution for either partnership caused any damage. It was paid but paid late.

[¶ 47] We cannot say the district court erred in awarding Red River Wings its distributions from Hoot.

## VII

[¶ 48] In their cross-appeal, the minority limited partners argue the district court erred in awarding them only $104,130 in

attorney fees rather than the $222,734 they had requested.

[¶ 49] Section 45–10.1–62, N.D.C.C., provided "[i]f a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to the limited partnership the remainder of those proceeds received by the plaintiff." "[I]t is well established that district courts are considered experts in determining what is a reasonable amount of attorney fees and we will not reverse the court's decision about the amount and reasonableness of the attorney fees absent a clear abuse of discretion." *Lynch v. Sweeney*, 2007 ND 81, ¶ 10, 732 N.W.2d 377. A district court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or if it misinterprets or misapplies the law. *Id.*

[¶ 50] The minority limited partners contend it was arbitrary for the district court to disallow any attorney fees incurred before September 26, 2002, which was the date they filed their case, because they had commenced their action in March 2000, discovery had begun in the federal court action between the majority limited partners and Lavelle, and discovery was conducted jointly due to the intertwined issues. In refusing to award the minority partners the entire amount requested, the district court reasoned:

> In response to the Court's request to submit itemized billing statements for those portions of the claim which the Court deemed derivative, the . . . plaintiffs submitted what has to be viewed as essentially their entire bill from 1999, three (3) years prior to actually filing the case to the Post Trial Brief. The

time entries alone consisted of eighty-one (81) pages seeking Two Hundred Twenty-two Thousand Seven Hundred Thirty-four and 00/100 Dollars ($222,-734.00).

> The Court has carefully reviewed the Amended Statement of Attorney's Fees and Expenses. The Court recognizes that the derivative claims in this matter were intertwined with other claims that were asserted in this matter. However, not all of the efforts spent on all of the claims were directly or even indirectly related to those derivative matters. The Court, having reviewed the billing statement has eliminated time entries which as presented do not indicate to the Court that they were related in any meaningful or substantial way to the derivative claims, or were duplicative of efforts of others or not reasonable.

[¶ 51] We conclude the district court did not abuse its discretion in awarding the minority limited partners $104,130 in attorney fees.

VIII

[¶ 52] In its cross-appeal, LTM argues the district court erred in dismissing its counterclaim against the majority limited partners for intentional interference with a contractual relationship by improperly terminating its management agreements with Canadian Wings and Manitoba Wings.

[¶ 53] Intentional interference with a contractual relationship is a recognized tort in this state. *Peterson v. Zerr*, 477 N.W.2d 230, 233 (N.D.1991). To establish a prima facie case of intentional interference with a contract, the plaintiff must prove: (1) a contract existed; (2) the contract was breached; (3) the defendant instigated the breach; and (4) the defendant instigated the breach without justification. *Van Sickle v. Hallmark & Assocs.,*

*Inc.,* 2008 ND 12, ¶ 24, 744 N.W.2d 532. Whether interference with a contractual relationship is justified is a question of fact. *Blair v. Boulger,* 336 N.W.2d 337, 342 (N.D.1983).

[¶ 54] The management agreements between LTM and the two limited partnerships provided:

> Termination for Cause—Notwithstanding Section 3.1 hereof, the engagement and retainer of the Manager by the Partnership pursuant to this Agreement may be terminated by the Partnership for cause, at any time, without payment of any compensation either by way of anticipated earnings or damages of any kind. For purposes hereof, the term "cause" shall be;
>
> > (a) fraud, felonious conduct or dishonesty of the Management Company
> >
> > (b) willful misconduct or gross negligence by the Management Company in the performance of its duties hereunder; or
> >
> > (c) breach by the Manager of any material provisions of this Agreement

[¶ 55] In its decision, the district court found that "[i]n addition to removing [Red River Wings] as the general partner, the [majority] defendants, through Hoot ... terminated the management contracts of Lavelle's management company, LTM, with each of the restaurants." The court found the "Majority took control of both partnerships after the vote to remove [Red River Wings] and to terminate the LTM Contract[s]. The [majority] defendants dictated the actions of each partnership through their control of Hoot ... and by boldly asserting their claimed right to take control to third parties." The court further found "the termination of the LTM Management Contract[s] brought the potential for liability and the Majority Group was well aware of that fact," the "reasons put forward by the Majority to remove

[Red River Wings] as the general partner and terminate the LTM contract were, for the most part, concocted from information received after the termination," and "[n]either Lavelle nor LTM committed any act that would be a 'cause' that would justify the termination of the contracts. The alleged 'causes,' most of which were discovered after the termination, were either inconsequential or were not supported by credible evidence." The court, however, dismissed the intentional interference claim, reasoning the "dissolution of the partnerships destroyed the object of the LTM management contracts."

[¶ 56] It is unclear whether the district court based its dismissal on the doctrine of frustration of purpose or the doctrine of impossibility. The doctrines are closely related. *See Island Dev. Corp. v. District of Columbia,* 933 A.2d 340, 349 (D.C.Cir.2007). Frustration of purpose "occurs when 'after a contract is made, a party's principal purpose is substantially frustrated *without his fault* by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made.'" *Tallackson Potato Co., Inc. v. MTK Potato Co.,* 278 N.W.2d 417, 424 n. 6 (N.D.1979) (quoting Restatement (Second) of Contracts § 285 (Tent. Draft No. 9) (1974) (emphasis added)). The doctrine of impossibility or impracticality is similarly described as "[w]here, after a contract is made, a party's performance is made impracticable *without his fault* by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981) (emphasis added). Neither doctrine applies if either the frustration or the impossibility is caused by a party to the

contract. *See Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 773 F.Supp. 809, 824 (W.D.Va.1991), *aff'd in part, reversed in part on other grounds*, 976 F.2d 203 (4th Cir.1992); *see also Cavalier County Mem'l Hosp. Ass'n v. Kartes*, 343 N.W.2d 781, 784 (N.D.1984) ("There is an implied condition of every contract not to prevent the other party from performing and not to render performance impossible"). If a party to a contract who causes frustration or impossibility cannot rely on the doctrines as defenses in a breach of contract action, we do not believe a third party who causes the frustration or impossibility in a contract between others may rely on the doctrines as defenses in an action for intentional interference with that contract. If, as the district court found, the majority limited partners caused the dissolution of the partnerships, the dissolution of the partnerships is no defense to LTM's intentional interference with contractual relations claim.

[¶ 57] We reverse the district court's dismissal of LTM's counterclaim and remand for findings on whether the majority limited partners are liable for damages for intentional interference with contractual relations.

IX

[¶ 58] LTM also argues the district court erred in awarding it prejudgment interest for unpaid management fees at the rate of 3 percent from December 21, 2005.

[¶ 59] Section 32–03–04, N.D.C.C., provides that "[e]very person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in the person upon a particular day, also is entitled to recover interest thereon from that day...." LTM's right to recover its unpaid management fees vested on October 25, 1998, when its management contracts with Canadian Wings and Manitoba Wings were improperly terminated, not on December 21, 2005, the date the district court "granted motions to dismiss all remaining claims against Shelly Dockter and Dyan Docker and, further, directed the dismissal of civil conspiracy and RICO claims as to all Defendants." Furthermore, when an agreement does not specify an interest rate, the interest rate for "any legal indebtedness" is 6 percent rather than 3 percent. N.D.C.C. § 47–14–05; *Kaler v. Kraemer*, 1999 ND 237, ¶ 24, 603 N.W.2d 698.

[¶ 60] We reverse and remand to the district court to award LTM prejudgment interest on its unpaid management fees at the rate of 6 percent from October 25, 1998.

X

[¶ 61] We reverse the award of damages to the minority limited partners and remand for a determination of the damages resulting from the dissolution of the limited partnerships on January 23, 1999. We reverse the district court's dismissal of LTM's counterclaim for intentional interference with contractual relations and remand for further findings. We also reverse and remand for entry of an order awarding LTM prejudgment interest at the rate of 6 percent from October 25, 1998. The judgment is otherwise affirmed.

[¶ 62] GERALD W. VANDE WALLE, C.J., ROBERT W. HOLTE, BRUCE E. BOHLMAN, S.JJ., and DONOVAN J. FOUGHTY, D.J.

[¶ 63] The Honorable DONOVAN JOHN FOUGHTY, D.J., the Honorable ROBERT W. HOLTE, S.J., and the Honorable BRUCE E. BOHLMAN, S.J.,

sitting in place of SANDSTROM, J., CROTHERS, J., and MARING, J., disqualified.